

# CERTIFIED SECURITIZATION ANALYSIS, LLC

446 Old County Road
Pacifica, CA 94044
*www.securitizationanalysis.com*

---

# MORTGAGE SECURITIZATION AUDIT & ANALYSIS REPORT
## July 19, 2012



## Prepared for:
### Asvini & Pravina Patel
### 24660 Vereda Corta
### Salinas, Ca. 93908

---

**Disclosure:** You have engaged Certified Securitization Analysis, LLC (CSA) to examine your real estate documents. This information is not to be construed as legal advice or the practice of law, pursuant to *Business and Professions Code § 6125 et seq*, it is the intent of CSA, its members, auditors and independent contractors, not to engage in activities that could be considered the practice of law by conduct exhibiting any of the following practices: "*...the doing and/or performing of services in a court of justice in any matter depending therein throughout the various stages and in conformity with the adopted rules of procedure. It includes legal advice and counsel and the preparation of legal instruments and contracts by which the legal rights are secured although such matter may or may not be depending in a court.*"

---

Copyright © 2010-2012 Lawrence M.Asuncion.   All Rights Reserved.

# Table of Contents

SECTION I: BORROWER(S) AND LOAN INFORMATION ................................................. 3
  BORROWER(S) AND PROPERTY INFORMATION ................................................................3
  ORIGINAL MORTGAGE LOAN TRANSACTION SUMMARY .....................................................3
  ORIGINAL LOAN/MORTGAGE TRANSACTION PARTIES ........................................................4

SECTION II: MORTGAGE SECURITIZATION ........................................................... 5
  THE SECURITIZATION TRANSACTION .........................................................................5
    INTRODUCTION ....................................................................................... 5
    THE ORIGINS OF MORTGAGE SECURITIZATION ......................................................... 6
    MORTGAGE SECURITIZATION BY PUBLIC AND PRIVATE LABEL PLACEMENTS ........................... 6
    THE BORROWER (MORTGAGOR) AND THE ORIGINATING LENDER (MORTGAGEE) ......................... 7
    THE SECURITIZATION PARTIES AND THEIR ROLES ..................................................... 12
    REAL ESTATE MORTGAGE INVESTMENT CONDUITS ("REMICS") ....................................... 15
    STANDING IN THE EVENT OF MORTGAGE DEFAULT ..................................................... 17
    MAINTAINING A VALID LIEN ON A SECURITIZED MORTGAGE ............................................ 18
    PROPER SECURITIZATION PROCESS/TRANSACTION FLOW CHART (MAINTAINING A VALID LIEN) ............. 19
  FORENSIC AUDIT - MORTGAGE LOAN SECURITIZATION .........................................................20
  SECURITIZATION PARTICIPANTS IDENTIFIED .................................................................25
    SIMPLIFIED FLOW CHART OF A PROPER PROCESS OF SECURITIZATION ................................. 26
    THE FEEDING FRENZY PERIOD FOR MORTGAGE SECURITIZATION (2002-2008) .......................... 38
    THE SUBVERTED SECURITIZATION PROCESS ............................................................ 39
    THE LEGAL ISSUES ................................................................................... 39
    SUBVERTED SECURITIZATION PROCESS/TRANSACTION FLOW CHART ................................... 41
    ROLE OF THE LOAN SERVICER ......................................................................... 42
    THE SERVICING PROCESS FLOW CHART ................................................................ 42

SECTION III: FORECLOSURE PROCESS REVIEW ....................................................44
  CHAIN OF TITLE REVIEW .....................................................................................44
    MORTGAGE LOAN DOCUMENTS AND FORECLOSURE PROCESS REVIEW .................................. 46
    MORTGAGE SECURITIZATION REVIEW .................................................................. 54

SECTION IV: DEFECTS AND DEFICIENCIES, CONCLUSION ........................................56
  LOAN MODIFICATION ...................................................................................... 56
  MORTGAGE SECURITIZATION ISSUES ....................................................................... 56
  FORECLOSURE ACTION DEFICIENCIES & DEFECTS ......................................................... 57
  CONCLUSION ............................................................................................. 60
  APPENDIX OF RECENT COMMENTARY .......................................................................64

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.

# SECTION I: BORROWER(s) AND LOAN INFORMATION

## Borrower(s) and Property Information

| BORROWER/MORTGAGOR | |
|---|---|
| Asvini & Pravina Patel | |
| **CURRENT ADDRESS** | **SUBJECT ADDRESS** |
| 24660 Vereda Corta Salinas, Ca. 93908 | 24660 Vereda Corta Salinas, Ca. 93908 |

## Original Mortgage Loan Transaction Summary

| | | | |
|---|---|---|---|
| **Origination Date:** (DOT Recorded 2/10/2006) | 10/06/2006 | "Teaser Rate" (until 10/31/2006): | 1.000% |
| **Loan Maturity (30-Year Loan):** | 11/01/2036 | Initial Interest Rate (effect. 11/1/2006): | 8.008% |
| | | Interest Life Cap: | 9.950% |
| **Loan Amount:** | $1,500,000.00 | Payment Recast (P & I): | 60 Months |
| **Original LTV** | 75.00% | Starting Mortgage Payment: | $4,824.59 |
| **FICO Score** (At Loan Origination) | 753 | Beginning: | 12/01/2006 |
| | | Payment Change Date: | 12/1/2007 |
| **Occupancy:** | Owner Occupied | Original Loan Number: | 0001400436 |
| **Loan Purpose:** | Cash Out Refinance | Servicing Assigned Loan Number: | 0031326416 |
| **Property Type:** | Single Family Residence | MIN: 1000242-0001400436-6 | |
| **Loan Program** | Adjustable Rate Mortgage | Rate Change Date: (and every month thereafter) | 12/01/2006 |
| **Negative Amortization Limit:** | 125% | Margin | 3.250% |
| **Riders:** | Adjustable Rate Rider | Index | 12-Month MTA |

Copyright © 2010-2012 Lawrence M. Asuncion. All Rights Reserved.

## Original Loan/Mortgage Transaction Parties

| BROKER | INITIAL LOAN SERVICER | BENEFICIARY |
|---|---|---|
| UNKNOWN | AMERICAN HOME MORTGAGE SERVICING, INC. | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS) |
| ORIGINAL LENDER | MORTGAGE TRUSTEE | CURRENT LOAN SERVICER |
| AMERICAN BROKERS CONDUIT | UNITED CAPITAL TITLE COMPANY | HOMEWARD RESIDENTIAL, INC. |

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.

# SECTION II: MORTGAGE SECURITIZATION

## The Securitization Transaction

### Introduction

Mortgage securitization is a financial transaction whereby hundreds of mortgage loans are pooled together and converted into securities. The loans are collected and packaged by a securitization "Sponsor" and sold to a "Depositor" who in turn sells and transfers these loans into a tax-advantaged trust entity, which is a special purpose vehicle (SPV) that holds the mortgage loans as collateral on the securities traded and sold by Wall Street and other firms to investors. The securitized mortgages held in the mortgage-backed securities (MBS) trust entity are rated and classified in "tranches" (with each tranche representing a different level of risk & return). The investors ("Certificate Holders") purchase the rights to cash generated from the borrowers' (mortgagors') principal and interest payments of the loans.

With securitization of the mortgages, the "Originating Lenders" are then able to take these loans (a non-liquid asset) off their books, eliminating the need to maintain the required capital reserves for contingency against default.

## MORTGAGE SECURITIZATION



## The Origins of Mortgage Securitization

Beginning in the early 1970s, the first mortgage-backed securities were created and offered as a way for the government and government sponsored entities (GSE) such as the Government National Mortgage Association (GNMA or Ginnie Mae), the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac), and the Federal National Mortgage Association (FNMA or Fannie Mae) to provide greater liquidity to the residential markets and promote American homeownership. Freddie Mac and Fannie Mae followed suit in an effort to create deeper mortgage markets. Investors were attracted to purchasing these insured mortgage pool certificates than investing in (buying) individual home loans, which would require a more complex and expensive operation than ownership of financial securities requires.

Among the reasons such new innovation in financing (securitization) added greater liquidity to the market is that the mortgage and asset-backed securities financial structure allowed investors with different risk tolerance to choose different rates of return as well as options in timing of receipt of investment income (principal repayment & interest). The securitization vehicle, a mortgage-backed securities trust (MBS trust) receiving PASS-THROUGH income is typically structured such that a certain group of investors (certificate holders) receives a lower rate of income, but in exchange, is not exposed to first losses incurred in the event of mortgage default. Other investors with an interest in the same securitized mortgage pool may bear the first loss position in exchange for higher income from the schedule mortgagor's (borrower's) payments received by the MBS trust. The cash flows from the pooled mortgages securing the MBS trust income are thus aggregated, and then re-divided into "tranches" owing to each class of bond issued by the Trust, each with a rating by independent credit rating agencies such as Moody's, Fitch and Standard & Poor's.

Fast forward to the present date, the market for mortgage and asset-backed securities has grown significantly to a size surpassing even the U.S. Treasury Market ($4 trillion) and all corporate bonds ($3.1 trillion). The mortgage-backed securities market is the largest segment of the U.S. bond market with approximately $4.6 trillion in mortgage-related debt outstanding in 2007 and an additional $1.5 trillion of asset-backed securities outstanding, the majority of which are backed by home equity loans.

## Mortgage Securitization by Public and Private Label Placements

Mortgage securitization may be issued by public and/or private entities. Public placements are originated by Government Sponsored Entities (GSE) such as Fannie Mae, Freddie Mac and Ginnie Mae and normally involve a single form of an investment bond called PASS-THROUGH Certificates. Private-label placements represent mortgages that have been aggregated on the secondary market by private investors and are done in tranches to represent the varying levels of risks associated with them.

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.

## The Borrower (Mortgagor) and the Originating Lender (Mortgagee)

The market for financial assets begins with a borrower requesting funds and a lender extending a loan. The relationship between the loan originator and the borrower represents the first necessary step in both conventional lending and the asset-backed securitization process. With the securitization model, the borrowers' previous bilateral relationship with a lender is replaced by the pooling of multiple borrowers' loans, and the ultimate funding of a loan coming from multiple investors as compared to a single lender.

The securitization process starts when a potential borrower needs a loan. The lender funds the loan in exchange for the borrower's contractual promise to pay the loan's principal with interest (promissory note), and the borrower's grant of a security interest in certain collateral, most often the property purchased or refinanced with the loan proceeds (Mortgage or Deed of Trust, depending on the state in which the loan originates.  The security instrument in the present case is a Mortgage.  For the purposes of the charts in this report, references to Deeds of Trust and Mortgages are interchangeable). See Chart 1 (next Page).



**Chart 1: Transfer of Mortgage from a Borrower to a Lender;
Contracts - Loan Documents between Borrower and Lender**

Thereafter (Chart 2), the lender sells/transfers pooled mortgages to a "Purchaser," who may be the securitization "Sponsor," usually an affiliate COMPANY of the lender or an investment bank.  The Purchaser may also purchase other loans from other lenders, benefiting from significant economies of scale, with a typical MBS trust composed of thousands of pooled mortgage loans worth $500 million to more than $1 billion.

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.



**Chart 2: Transfer of Mortgages from Lender to Purchaser; Contracts - Mortgage Loan Purchase Agreement (MLpa) & Interim Service Agreement (ISA) between the Lender and Purchaser**

The following are the advantages and benefits to the originating lender packaging and selling pooled mortgages using the structure of a securitization:

1. Immediate liquidity on otherwise illiquid assets such as 30-year mortgages.
2. Maximize the amount obtained from selling and transferring the mortgages and immediately realize the profits.
3. Avoid, often through associated credit default insurance, carrying on the lender-transferor's balance sheet reserves and contingent liability, thereby escaping any reserve requirements imposed upon contingent liabilities that would otherwise be carried on the transferor's books.
4. Use the liquid funds to enter into new loan transactions and to earn more profits that are immediately realized... again and again (as well as the profits, fees and charges associated with the new transactions... and so on).
5. Insulate the lender-transferor from liability and moves the liability to the insurers.
6. Maximize earnings by transferring the assets so that the assets cannot be reached by the creditors of the transferor institution or by the trustee in the event of the originator's bankruptcy. (By being *"bankruptcy-remote"* the value to investors of the illiquid assets is increased and investors are willing to pay more.)
7. Control management of the illiquid asset by being appointed as the servicer of the mortgage and earn service fees.
8. Increase the value of the Trust securities through their issuance by a tax-free PASS-THROUGH Trust entity so that only the investor who receives income from the Trust is taxed. This avoids "double taxation" of both the trust and the investor.
9. Leverage the mortgage transaction by creating mortgage-backed certificates that can be pledged as an asset, which can be re-securitized and re-pledged to create new financial securities [collateralized debt obligations or CDOs] secured by the cash flows not of the loans, but of the MBS whose cash flows are derive from them.

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.

The loan originator/originating lender typically sells the pooled loans under a **Mortgage Loan Purchase Agreement (MLpa)**, which contains warranties and representations on the loans sold. Between the sale date of the loan and the closing date of the securitization transaction, the lender will agree to continue to "service" (collect upon) the loan. Either the MLpa or an Interim Service Agreement (ISA) provides for this interim servicing arrangement. The lender expressly acknowledges that the Purchaser is buying these mortgages for the purpose of securitization. The borrower's commitment to repay the loan and the lender's security backing the loan will be evidenced by loan documents namely the mortgage and a note.

The Purchaser (often along with other purchasers) sells loans to the "Depositor", a *bankruptcy-remote entity* setup for the purpose of "depositing" loans in a securitization trust. The Depositor buys loans from each purchaser under a further MLpa between purchaser and depositor. The Purchaser-Depositor MLpa [in this instance, the agreement is entitled the Mortgage Loan Sale and Assignment Agreement ["MLSAA"]] may or may not assign the rights under the lender-purchaser MLpa.   The lender and/or the Purchaser also provides the Depositor with indemnity for prospectus information and warranting/representing "truthfulness of information," and the depositor then places such information and indemnities in the prospectus (and prospectus supplement) or other offering documents.



Chart 3: Transfer of Mortgages from Purchaser to Depositor;
Contracts - MLpa between the Purchaser and Depositor

After buying the loans from the purchaser(s), the depositor holds the loans (for a "split second") before depositing the loans into an issuer securitization trust. Using a "shelf registration," the Depositor has often filed a prospectus describing the securitization practices. Then, for each subsequent securitization,

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.

the Depositor files a prospectus supplement describing that specific securitization transaction. These offering documents describe the securitization transaction parties, the classes of bond certificates to be issued, the yield on the various tranches/classes of certificates, the loan pool, the trust administration, and certain legal matters (See Chart 4). The MLPA representations and warranties may also be stated in the one or more offering documents. **The Pooling and Servicing Agreement (PSA)**, which is the operative legal contract that creates the MBS Trust and governs its terms, operation and administration, provides for the transfer of the loans on a specified closing date. The pa repeats the key MLpa terms or provisions, or set out other terms relevant to the MLPA.



**Chart 4: Depositor "depositing" pooled loans/mortgages to an issuer Trust for loan pool; Depositor prepares Prospectus (& Supplemental Prospectus); Contracts - Pooling and Service Agreement (pa) between the Loan Servicer, Depositor and Trust**

The MBS trust created by the Purchaser for the issuer is called a **Special Purpose Vehicle (SPV)**. The SPV is organized to be a **Qualified Special Purpose Entity (QSPE)**, which receives a favorable "PASS-THROUGH" or single tax treatment based on strict IRS rules. To avoid the double taxation of the trust and the certificate holders (multiple investors who purchased the bond certificates from the trust), the trust is classified as a **Real Estate Mortgage Investment Conduit (REMIC)**, a category of QSPE. Upon qualification as a REMIC, the income of the trust (scheduled mortgagors' payments) is taxed only at the Certificate Holders' (Investors') level.

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.



**Chart 5: Depositor "depositing" pooled loans/mortgages to an Issuer Trust for loan pool;**
**Depositor prepares Prospectus (& Supplemental Prospectus);**
**Contracts - pa between the Loan Servicer, Depositor and Trust.**

The pa provides for the trust administration through the Trustee and Servicer. The SPV or the trust transfers the right to service the collection of income from the pooled assets to a third party or in most cases to the loan originator/originating lender itself. The Servicer collects borrower obligations on the loans subsequent to the securitization closing date on behalf of the trustee. The rights to service the mortgage loans are called Mortgage Servicing Rights or MSR. The rights to service mortgage assets are also considered as assets with recognized value. The Trustee is the nominal legal owner of the trust assets for the benefit of the investors (Certificate Holders).

Copyright © 2010-2012 Lawrence M. Asuncion.  All Rights Reserved.

## SECURITIZATION PARTICIPATIONS



Chart 6: Securitization participants (total picture)

## The Securitization Parties and Their Roles

(Note: The name of the Securitization Participants in this specific case in all caps is underlined)

1. **Loan Originator/Originating Lender**. AMERICAN HOME MORTGAGE CORP. (d.b.a AMERICAN BROKERS CONDUIT. The "originator" is the lender that provided the funds to the borrower (mortgagor) at loan closing or close of escrow. Usually the originator is the named "Lender" (mortgagee) in the Promissory Note and in the security instrument (Mortgage or Deed of Trust). Majority of lenders/originators securitize loans because of the numerous advantages and benefits previously mentioned.

2. **Warehouse Lender**. The Originator probably borrowed the funds on a line of credit from a short-term revolving warehouse credit facility (commonly referred to as a "warehouse lender"); nevertheless the money used to close the loan were technically and legally the Originator's funds. Warehouse lenders are either "wet" funders or "dry" funders. A wet funder will advance the funds to close the loan upon the receipt of an electronic request from the originator. A dry funder, on the other hand, will not advance funds until it actually receives the original loan documents duly executed by the borrower.

3. **Securitizer: Sponsor, Aggregator or Purchaser**. UBS REAL ESTATE SECURITIES, INC. The Sponsor is the party that securitizes the pool of mortgage loans. This means that it was the final aggregator of the loan pool and then sold the loans directly to the Depositor, which in turn sold them to the securitization trust.

Copyright © 2010-2012 Lawrence M.Asuncion. All Rights Reserved.

In order to obtain the desired ratings from the independent ratings agencies such as S&P, Moody's or Fitch, the Sponsor normally is required to retain some exposure to the future value and performance of the loans in the form of purchases of the most deeply subordinated classes of the securities issued by the Trust, i.e., the classes last in line for distributions and first in line to absorb losses (commonly referred to as the "first loss pieces" of the deal).

4. **Depositor.** <u>MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.</u> The Depositor exists for the sole purpose of enabling the transaction to have the key elements that make it a securitization in the first place: a "true sale" of the mortgage loans to a "bankruptcy-remote" and "FDIC-remote" purchaser. The Depositor purchases the loans from the Sponsor, sells the loans to the Trustee of the securitization trust, and uses the proceeds received from the trust to pay the Sponsor for the Depositor's own purchase of the loans. It all happens simultaneously, or as nearly so as theoretically possible. The length of time that the Depositor owns the loans has been described as "one nanosecond."

The Depositor has no other functions, so it needs no more than a handful of employees and officers. Nevertheless, it is essential for the "true sale" and "bankruptcy-remote"/"FDIC-remote" analysis that the Depositor maintains its own corporate existence separate from the Sponsor and the Trust and observes the formalities of this separate corporate identity at all times. The "Elephant in the Room" in all structured financial transactions is the mandatory requirement to create at least two "true sales" of the notes and mortgages between the Originator and the Trustee for the Trust so as to make the assets of the Trust both "bankruptcy" and "FDIC" remote from the originator. And, these "true sales" will be documented by representations and attestations signed by the parties; by attorney opinion letters; by asset purchase and sale agreements; by proof of adequate and reasonably equivalent consideration for each purchase; by "true sale" reports from the three major "ratings agencies" (Standard & Poor's, Moody's, and Fitch) and by transfer and delivery receipts for mortgage notes endorsed in blank.

5. **Trustee.** <u>U.S. BANK NATIONAL ASSOCIATION</u> The Trustee is the nominal owner of the loans on behalf of the Certificate Holders (Investors) at the end of the securitization transaction. Like any trust, the Trustee's powers, rights, and duties are defined by the terms of the transactional documents that create the trust, and are subject to the terms of the trust laws of some particular state, as specified by the "Governing Law" provisions of the transaction document that created the trust. The vast majority of the residential mortgage backed securitized trusts are subject to the applicable trust laws of Delaware or New York. The "Pooling and Servicing Agreement" (or, in "Owner Trust" transactions as described below, the "Trust Indenture") is the legal and governing document that creates these common law trusts and the rights and legal authority granted to the Trustee is no greater than the rights and duties specified in this Agreement. The Trustee is paid based on the terms of each structure. For example, the Trustee may be paid out of interest collections at a specified rate based on the outstanding balance of mortgage loans in the securitized pool; the Master Servicer may pay the Trustee out of funds designated for the Master Servicer; the Trustee may receive some on the interest earned on collections invested each month before the investor remittance date; or the Securities Administrator may pay the Trustee out of their fee with no charges assessed against the Trust earnings. Fee amounts range between a low of .0025% to as high as .009%.

6. **Indenture Trustee and Owner Trustee.** Most private-label securitizations are structured to meet the Internal Revenue Code requirements for tax treatment as a "Real Estate Mortgage Investment Conduit

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.

("REMIC"). However some securitizations (both private-label and Government Sponsored Enterprises or GSEs) have a different, non-REMIC structure usually called an "Owner Trust." In an Owner Trust structure the Trustee roles are divided between an Owner Trustee and an Indenture Trustee. As the names suggest, the Owner Trustee owns the loans; the Indenture Trustee has the responsibility of making sure that all of the funds received by the Trust are properly disbursed to the investors (bond holders) and all other parties who have a financial interest in the securitized structure. These are usually Delaware statutory trusts, in which case the Owner Trustee must be domiciled in Delaware.

7. **Primary (or Sub- Servicer)**. <u>AMERICAN HOME MORTGAGE SERVICING, INC.</u> The Primary Servicer services the loans on behalf of the Trust. Its rights and obligations are defined by a loan-servicing contract, usually located in the Pooling and Servicing Agreement in a private-label (non-GSE) deal. The trust may have more than one servicer servicing portions of the total pool, or there may be "Secondary Servicers," "Default Servicers," and/or "Sub-Servicers" that service loans in particular categories (e.g., loans in default). Any or all of the Primary, Secondary, or Sub-Servicers may be a division or affiliate of the Sponsor; however under the servicing contract the Servicer is solely responsible to the Trust and the Master Servicer (see next paragraph). The Servicers are the legal entities that do all the day-to-day "heavy lifting" for the Trustee such as sending monthly bills to borrowers, collecting payments, keeping records of payments, liquidating assets for the Trustee, and remitting net payments to the Trustee.

The Servicers are normally paid based on the type of loans in the Trust. For example, a typical annual servicing fee structure may be: .25% annually for a prime mortgage; .375% for an Alt-A or Option ARM; and .5% for a subprime loan. In this example, a subprime loan with an average balance over a given year of $120,000 would generate a servicing fee of $600.00 for that year. The Servicers are normally permitted to retain all "ancillary fees" such as late charges, check by phone fees, and the interest earned from investing all funds on hand in overnight US Treasury certificates (sometimes called "interest earned on the float").

8. **Master Servicer**. <u>WELLS FARGO BANK, N.A.</u> The Master Servicer is the Trustee's representative for assuring that the Servicer(s) abide by the terms of the servicing contracts. For trusts with more than one servicer, the Master Servicer has an important administrative role in consolidating the monthly reports and remittances of funds from the individual servicers into a single data package for the Trustee. If a Servicer fails to perform or goes out of business or suffers a major downgrade in its servicer rating, then the Master Servicer must step in, find a replacement and assure that no interruption of essential servicing functions occurs. Like all servicers, the Master Servicer may be a division or affiliate of the Sponsor but is solely responsible to the Trustee. The Master Servicer receives a fee, small compared to the Primary Servicer's fee, and based on the average balance of all loans in the Trust.

9. **Custodian**. <u>WELLS FARGO BANK, N.A.</u> The Master Document Custodian (MDC) takes and maintains physical possession of the original hard-copy Mortgage Notes, Deeds of Trust, the assignments, sales and purchase agreements and certain other "key loan documents" that the parties deem essential for the enforcement of the mortgage loan in the event of default. The MDC must also execute representations and attestations that all of the transfers really and truly occurred "on time" and in the required "order" and that "true sales" occurred at each link in the chain.

- This is done for safekeeping and also to accomplish the transfer and do the negotiation for the

Copyright © 2010-2012 Lawrence M.Asuncion. All Rights Reserved.

possession of the Notes that is essential under the Uniform Commercial Code for a valid transfer to the Trustee to occur.
- Like the Master Servicer, the Master Document Custodian is responsible by contract solely to the Trustee (e.g., the Master Document Custodial Agreement). However, unlike the Master Servicer, the Master Document Custodian is an institution wholly independent from the Servicer and the Sponsor.
- There are exceptions to this rule in the world of Fannie Mae/Freddie Mac ("GSE") securitizations. The GSE's may allow selected large originators with great secure storage capabilities (in other words, large banks) to act as their own Master Document Custodians. But even in those cases, contracts make clear that the GSE Trustee, not the originator, is the nominal owner of the Note and the mortgage loan.
- The Master Document Custodian must review all original documents submitted into its custody for strict compliance with the specifications set forth in the Custodial Agreement, and deliver exception reports to the Trustee and/or Master Servicer as to any required documents that are missing or fail to comply with those specifications.
- In so doing the Custodian must in effect confirm that for each loan in the Trust there is a "complete and unbroken chain of transfers and assignments of the Notes and Mortgages."
- This does not necessarily require the Custodian to find assignments or endorsements naming the Depositor or the Trustee. The wording in the Master Document Custodial Agreement must be read closely. Defined terms such as "Last Endorsee" may technically allow the Custodian to approve files in which the last endorsement is from the Sponsor in blank, and no assignment to either the Depositor or the Trustee has been recorded in the local land records.
- In many private-label securitizations a single institution fulfills all of the functions related to document custody for the entire pool of loans. In these cases, the institution might be referred to simply as the "Custodian" and the governing document as the "Custodial Agreement."

## Real Estate Mortgage Investment Conduits ("REMICS")

The Tax Reform Act of 1986 established the legal basis of REMICs (100 Stat. 2085, 26 U.S.C.A. §§ 47, 1042), which eliminated double taxation of these securities. The principal advantage of forming a REMIC for the sale of mortgage-backed securities (MBS) is that the REMIC is treated as PASS-THROUGH vehicles for tax purposes, avoiding double-taxation.   A REMIC can be structured as an entity (i.e., partnership, corporation, or trust) or simply as a segregated pool of assets, so long as the entity or pool meets certain requirements regarding the composition of assets and the nature of the investors' interests. No tax is imposed at the REMIC level. To qualify as a REMIC, all of the interests in the REMIC must consist of one or more classes of "regular interests" and a single class of "residual interests." Regular interests can be issued in the form of debt, stock, partnership interests, or trust certificates, or any other form of securities, but must provide the holder the unconditional right to receive a specified principal amount and interest payments. REMIC regular interests are treated as debt for federal tax purposes. A residual interest in a REMIC, which is any REMIC interest other than a regular interest, is, on the other hand, taxable as an equity interest.

In most mortgage-backed securitizations, the owner of a pool of mortgage loans (usually the Sponsor) sells and transfers such loans to a QSPE, usually a trust, that is designed specifically to qualify as a REMIC,

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.

and simultaneously, the QSPE issues securities that are backed by cash flows generated from the transferred assets to investors in order to pay for the loans along with a certain return. If the special purpose entity qualifies as a REMIC, then any income of the QSPE is "passed through" and, therefore, not taxable until the income reaches the holders of securities issued by the REMIC, also known as beneficiaries of the REMIC trust.

**Accordingly, it can be argued that the trustee, the QSPE, and the other parties servicing the trust, have no legal or equitable interest in the securitized mortgages. Therefore, it can be further asserted that any servicer who alleges that they are, or that they have the right or have been assigned the right to claim, that they are the holder of the note for purposes of standing to bring an action of foreclosure, is stating a legal nullity.** Any argument containing such an allegation by the servicer would be questionable on this basis. Of course, that is exactly what the servicer of a securitized mortgage purported to be in default claims. The same is the case when a lender makes that same claim. The party shown as "Lender" on the mortgage note was instrumental in the sale and issuance of the certificate-to-certificate holders, which means the lender(s) knew that they were not any longer the holder of the note.

The QSPE is a weak repository and is not engaged in active management of the assets and so, a servicing agent is appointed. **Moreover, all legal and equitable interest in the mortgages is required by the REMIC to be passed through to the certificate holders. Compliance with the legal limitations on REMICs and insulating the trust assets from creditors of third parties (who create or service the trust) leads to unilateral restructuring of the terms and conditions of the original note and mortgage.**

A typical mortgage pool consists of anywhere from 2,000 to 5,000 loans. This represents millions of dollars in cash flow payments each month from a servicer (receiving payments from borrowers) to a REMIC (QSPE) with the cash flow "passing through", tax-free, to the beneficiaries of the trust (investors). Those proceeds are not taxed until received as income to the investors. Only the investors have to pay income taxes on the payments of mortgage interest received.

**TO EMPHASIZE AGAIN, in order for one of these investment trusts to qualify for the "pass through" tax benefit of a REMIC, ALL LEGAL AND EQUITABLE INTEREST IN THE MORTGAGES HELD IN THE NAME OF THE TRUST ARE VESTED IN THE INVESTORS, not in anyone else AT ANY TIME. If legal and/or equitable interest in the mortgages held in the name of the trust is claimed by anyone other than the investors, those that are making those misrepresentations are either defrauding the investors, or the homeowners & courts, or both.**

So, if the trust, or a servicer, or a trustee, acting on behalf of the trust, is found to have violated the very strict REMIC guidelines (put in place in order to qualify as a REMIC), the "pass through" tax status of the REMIC can be revoked.

According to **Section 860 of the Internal Revenue Code**, in order for an investment entity to qualify as a REMIC, all steps in the "contribution" and transfer process (of the notes) **must be true and complete sales between the parties and must be accomplished within the three month time limit from the date of "startup" of the entity.** Therefore, every transfer of the note(s) must be a true purchase and sale, and, consequently the note must be endorsed from one entity to another. Any mortgage note/asset identified for inclusion in an entity seeking REMIC status must be sold into the entity within the three-

Copyright © 2010-2012 Lawrence M.Asuncion. All Rights Reserved.

month time period calculated from the official startup day of the REMIC. Any procedural defect relating to endorsement, notarization, assignment of rights, and recordation renders foreclosure action on the loan asset on behalf of the REMIC vulnerable to stay of foreclosure, and possible dismissal through absence of proper standing to proceed.

## Standing in the Event of Mortgage Default

Before securitization, the holder of an enforceable note has a financial responsibility for any losses that may occur arising from a possible default, which means that holder also has the authority to take steps to avoid any such losses (the right to foreclose). Securitization, however, effectively severs such financial responsibility for losses.

With securitization the mortgage is converted into something different from what was originally represented to the mortgagor/homeowner. For one thing, since the party (or parties) taking action to foreclose does not actually hold any legal or equitable interest in any securitized mortgage, they have not realized any loss or damages resulting from the purported default. Therefore, it also follows that the foreclosing party avoids the liability, which could result if a class of certificate holders claimed wrongful injury resulting from a modification made to achieve an alternate dispute resolution.

Securitization also makes the mortgage and note unalienable. The reason is simple: once certificates have been issued, the note cannot be transferred, sold or conveyed; at least not in the sense that such a transfer, sale, or conveyance should be considered lawful, legal, and legitimate. This is because the securitized note forever changes the nature of that instrument in an irreversible manner. It might appear that the inability to alienate the note has no adverse consequences for the debtor, but recent history disproves this notion.  Several legislative and executive efforts to pursue alternative dispute resolution and to provide financial relief to distressed homeowners have been thwarted by the inability of the United States government to buy securitized mortgages without purchasing most of the certificates issued.

An SPV cannot sell any individual mortgage because the certificate holders do not hold mortgages individually; the certificate holders own the thousands of mortgages held in the name of the REMIC collectively. Likewise, the certificate holders cannot sell the mortgages. All the certificate holders have are the securities, each of which can be publicly traded. The certificate holders are, in no sense, holders of any specific individual note and have no legal interest in any specific individual note.  The certificate holders do not each hold undivided fractional interests in a note, which added together, total 100%. The certificate holders also are not the assignees of one or more specific installment payments made pursuant to the note.

For the certificate holder, there is no note. A certificate holder does not look to a specific note for their investment's income payment. Instead, the certificate holder holds a security to a bond with specific defined payments. The issuer of trust certificates is selling segments of cash flow. The concept of securitization is brilliant. It began as a simple idea; a way to convert illiquid, long term debt into liquid, tradable short-term debt. It cashes out the lender, allowing the lender to make new "loans" while realizing an immediate profit on the notes sold.

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.

## Maintaining a Valid Lien on a Securitized Mortgage

To visually frame the complete picture relating to the required legal processes associated with securitization, Chart 7 herein shows and follows the flow of the required proper assignments and actual possession of the mortgagor's original "wet ink" Promissory Note and Deed of Trust (Security Instrument assignment, equivalent to a Mortgage) for a party enforcing foreclosure action against the borrower. Such a borrower may succeed in delaying or stopping legal action by the foreclosing party by having the court examine the standing of the foreclosing party and that party's records and procedures.

The procedure for selling of the loans was to create a situation whereby certain REMIC tax laws were observed, and whereby the Issuing Entity and the Lender would be protected from issues regarding either entity going into bankruptcy. For the MBS Trust to acquire this protection from Lender and Issuer bankruptcy, two "True Sales" of the loans had to occur, when loans were transferred to different entities. A "True Sale" of the loan would be a circumstance whereby one party owned the Note, and then sold it to another party. An offer would be made, and then accepted, with compensation given to the "Transferor" in return for the Note. The Notes would be transferred, and the security instruments (Mortgages or Deeds of Trust) "assigned to the buyers" of the Note, with an Assignment made every step of the way, and each Note endorsed to the next party.

At least in theory, that is how the process would work. Chart 7 (next page) outlines the proper process to maintain a valid lien, one that would permit a servicer of an MBS Trust to foreclose on a borrower in purported default.

Copyright © 2010-2012 Lawrence M. Asuncion. All Rights Reserved.

## Proper Securitization Process/Transaction Flow Chart (Maintaining a Valid Lien)



**Chart 7: Flow Chart Showing Proper Assignments to Maintain a Valid Lien in a Securitized Mortgage**

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.

# Forensic Audit - Mortgage Loan Securitization

CSA reviewed the process of Securitization as it relates to the subject mortgage loan. It was noted that:

- AMERICAN HOME MORTGAGE CORP. (hereinafter "AHMC") d.b.a. AMERICAN BROKERS CONDUIT (hereinafter "ABC"), the original lender in the Promissory Note ("Note") and Deed of Trust ("DOT"), originated the subject mortgage loan on October 06, 2006; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (hereinafter "MERS") was named lender's nominee, successors and assigns, and ABC's beneficiary under the DOT. However, MERS was not referenced on the Note in any capacity.

NOTE: AMERICAN HOME MORTGAGE CORPORATION ("AHMC") originated several of its loans using the trade name AMERICAN BROKERS CONDUIT ("ABC.") AHMC is wholesale division of AMERICAN HOME MORTGAGE INVESTMENT CORP. ("AHMIC.")  AHMIC invested in home loans and mortgage securities, serviced mortgage accounts and originated loans from a network of branches. AHMIC offered "*Alt-A*" mortgages through AHMC, loans that fall between prime and subprime in quality, as well as adjustable-rate loans. The table lender/originator on the subject loan is AHMC doing business (d.b.a.) under its trade name ABC.

Founded in 1987, AHMC was once in the top 10 largest retail mortgage lender in the United States by originating $59 billion in loans. On July 31, 2007, AHMC announced that it can no longer fund home loans and was liquidating its assets. On August 6, 2007, the company filed for Chapter 11 bankruptcy protection in Wilmington Delaware federal court. The week before its bankruptcy filing, the company said that many of its lenders had demanded their money back, and that AHMC was also unable to deliver on about US$ 800 million in commitments for housing loans, and had laid off nearly ninety percent of its 7,000 employees. AHMC stated that it was focused on earning net interest income from self-originated loans and mortgage-backed securities, and through its taxable subsidiaries, the company will be shifting its business from originating to servicing mortgage loans for institutional investors.

AHMC's mortgages were originated through its more than 600 retail and wholesale loan production offices located in 45 states and the District of Columbia, as well as from mortgage brokers and purchased from correspondent lenders. These mortgages were serviced at the AHMC's servicing center in Irving, Texas. Its mortgage servicing company, AMERICAN HOME MORTGAGE SERVICING, INC. (hereinafter "AHMSI"), was sold to *Wilbur Ross & Co. LLC*, as part of the bankruptcy liquidation, in November 2007. *Wilbur Ross*, is chief executive officer of *WL Ross & Co.*, a company that specializes in reorganizing distressed companies. *W. Ross* founded the New York-based company in 2000 after overseeing the bankruptcy practice at Rothschild Inc.

*W. Ross* bought AHMSI from its bankrupt lender parent in 2008, and later added operations and servicing contracts from *H&R Block Inc., Citigroup Inc. and Taylor, Bean & Whitaker Mortgage Corp.* Mortgage Servicers collect payments from homeowners, negotiate loan modifications and foreclose on properties when borrowers default.

In an Oct. 23, 2008, interview with Bloomberg Radio, *Ross* said AHMSI was the second-largest

Copyright © 2010-2012 Lawrence M.Asuncion.  All Rights Reserved.

servicer of subprime mortgages in the U.S. and was "eager" to continue expanding. The company has servicing operations in Irvine, California, Jacksonville, Florida, and Pune, India, according to its website.

Banks and loan servicers are under scrutiny for their foreclosure practices following accusations they relied on faulty documentation to foreclose on people's homes. Attorneys General in all 50 states have launched a coordinated investigation into the issue.

Billionaire *Wilbur Ross'* AHMSI, facing lawsuits by attorneys general in two states, was sued by a homeowner who accused the firm of using tactics that lead to improper foreclosures. The lawsuit, filed in federal court in Dallas, seeks class-action status on behalf of homeowners with mortgages serviced by AHMSI going back to 2006. "AHMSI's illegal, unfair and deceptive business practices victimize borrowers" across the U.S.", according to the complaint. The complaint filed by *Kay Van Hauen* of Sanger, Texas, follows lawsuits by *Greg Abbott*, the state's Attorney General, and Ohio Attorney General *Richard Cordray*. They separately sued AHMSI, based in Coppell, Texas, for alleged violations of consumer protection laws. The complaint alleges that AHMSI routinely and systematically assesses unwarranted fees against consumers, resulting in premature default that often gives rise to unfair and improper foreclosure proceedings."

In his lawsuit, the Ohio Attorney General said AHMSI required borrowers to sign loan modifications, forbearance agreements and security-retention agreements that contain "illegal and unfair provisions and are unconscionably one- sided" in the company's favor. AHMSI also provided "incompetent, inadequate and inefficient customer service," lost documents and failed to respond to requests by borrowers for assistance, according to the complaint.

* It is well known that almost all the major lenders sold majority of their loans during the frenzied period of mortgage securitization from 2002 to early-2008. Shortly after loan funding, wholesale lenders (like AHMC d.b.a. ABC) sell mortgages they originate (to their correspondent lender channels) through a securitization structure because of the immediate benefits it provides. Mortgage securitization allows the lender to instantly turn an illiquid asset such as a 30-year loan into liquid asset and immediately earn profits. The lender could then use the liquid funds to enter into new loan transactions and to earn more profits that are immediately realized... again and again (as well as the profits, fees and charges associated with the new transactions... and so on.) In addition, the lender earns monthly fees for servicing the loan from the securitization trust.

* Specifically, AHMC's *"30-year Adjustable Rate Note, Negative Amortization"* loan product (as in the subject mortgage loan) was one of the main types of mortgage loans that ABC sold and securitized in the secondary market. This particular loan product is considered predatory as the borrower has the option to pay less than an interest only payment ("minimum payment") wherein the principal balance on the loan normally increases substantially (as in the subject loan up to 125% of the original loan principal). The borrower's debt-to-income ratio is typically calculated at the lesser payment, based on an initial "teaser" interest rate (1.000% "Start Rate" in the case of the subject loan) for the initial monthly payment.

* As noted, MERS was named at the outset as ABC's nominee under the DOT. MERS assigned a

---

Copyright © 2010-2012 Lawrence M.Asuncion. All Rights Reserved.

mortgage identification number ("MIN") on the subject mortgage loan. MERS' MIN 1000242-0001400436-6 is shown on the first page of the DOT.

*FACT: Normally, when MERS is named as nominee beneficiary at the onset in the mortgage (under the Deed of Trust only but not on the mortgage Note), it is almost certain that the lender originating the mortgage loan intends to securitize such loan shortly after its origination/funding.*

### MERS' WEB SITE INFORMATION (on 7/17/2012):

* MERS' MIN 1000242-0001400436-6, on the subject loan showed it is on <u>inactive status</u>. **HOMEWARD RESIDENTIAL, INC.** is shown as the current Loan Servicer and **U.S. BANK NATIONAL ASSOCIATION** as **TRUSTEE**.



* Given that AHMC sold to the secondary market substantially all its *ALT-A* loan products, CSA's research, investigation, and forensic audit focused on all of the SEC filings for mortgage-backed securities trusts ("MBS trusts") formed in 2007 where the named loan originator and initial Transferor/sponsor in the securitization transaction was AHMC and U.S. BANK NATIONAL ASSOCIATION (hereinafter "U.S. BANK") serves as Trustee for the benefit of the certificate-holders (investors) of the securitization trust. The first clue that AHMC sold the subject mortgage loan in the secondary market was the fact that MERS was designated as nominee beneficiary in the deed of trust and there is an Investor associated with the subject loan.

* With the date of the origination of the subject loan on October 06, 2006 on one hand, and on the other, the specified "Cut-off Date" of December 01, 2006 and "Closing Date" on January 16, 2007 of one of MBS trusts reviewed where the loan originator, transferor and sponsor in the securitization transaction was AHMC and U.S. BANK acts as Trustee, **MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-1** (hereinafter **"MASTR ARM TRUST 2007-1"**) easily stands out as the MBS Trust where the subject loan was securitized. The first "Distribution Date" (of income) to certificate-holders (investors) of this MBS Trust was on January 25, 2007, making it timely for the loan's second monthly mortgage

Copyright © 2010-2012 Lawrence M.Asuncion. All Rights Reserved.

payment due date. **MASTR ARM TRUST 2007-1** (the "MBS Trust") with an election and continuing qualification as a Real Estate Mortgage Investment Conduit ("REMIC") was formed with the execution of the *Pooling and Servicing Agreement* ("PSA") dated 12/01/2006. The PSA is the operative legal and binding contract governing the terms, operation, administration of the securitization transaction, as well as the ownership of the securitized mortgage loans.

• Below (next page) is a summary table listing 25 SEC Filings of *Documents and Exhibits* submitted from 12/21/2006 to 3/31/2008 (SEC File # 333-130373-20) by the Securitization Registrant and Depositor **MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.** (hereinafter "**MASTR**") for the MBS Trust: **MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1.** Among others, these SEC filings included:

1. the *Prospectus Supplement* dated 1/16/2007 *[To Prospectus dated 10/17/2006]* filed on 1/17/2007 pursuant to SEC Rule 424(b)(5);

2. the *Pooling and Servicing Agreement* ("PSA") dated 12/01/2006 filed on 1/31/2007 as Form 8K for 1/31/2007 EX-4.1. The PSA dated 12/01/2006, is between **UBS REAL ESTATE SECURITIES, INC.** (hereinafter "**UBS RES**") as loan *Transferor*, **MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.** ("**MASTR**") as *Depositor*; **WELLS FARGO BANK** (hereinafter "**WFB**") as *Master Servicer*; and **U.S. BANK NATIONAL ASSOCIATION** ("**U.S. BANK**") as *Trustee*;

3. the *Trust Agreement* dated 12/01/2006 filed on 1/31/2007 as Form 8K for 1/31/2007 EX-99.1. This agreement is between **MASTR**, as *Depositor*, **U.S. BANK**, as *Trustee*, and **WFB**, as *Trust Administration*;

4. the *Mortgage Loan Purchase Agreement* ("MLPA") dated 12/01/2006 filed on 1/31/2007 as Form 8K for 1/31/2007 EX-99.2. This agreement is between **AMERICAN HOME MORTGAGE CORP.** ("**AHMC**"), as the "Seller", **MASTR**, as the **COMPANY** and **UBS RES** as the *Transferor*;

5. the *Master Loan Purchase and Servicing Agreement* ("MLP&SA") dated 12/01/2005 filed 1/31/2007 as Form 8K for 1/31/2007 EX-99.3. This agreement is between **AMERICAN HOME MORTGAGE CORP.** ("**AHMC**"), as *Seller*, **AMERICAN HOME MORTGAGE SERVICING, INC.** (hereinafter "**AHMSI**") as *Servicer* and **UBS RES** as *Initial Purchaser*; and

6. the *Assignment, Assumption and Recognition Agreement* ("AA&RA") dated 1/16/2007 filed 1/31/2007 as Form 8K for 1/31/2007 EX-99.4. This agreement is between **USB RES** as *Assignor*, **MASTR** as *Assignee* and **AHMSI** as *Servicer*.

## Summary Table of SEC FILINGS

### MASTR Adjustable Rate Mortgages Trust 2007-1

*Closely Related:* Mortgage-Asset Securitization Transactions Inc - SEC #855018 - 12/21/07 ⧉ Go

*Click on these tabs to view other information related to MASTR Adjustable Rate Mortgages Trust 2007-1*

*View:* Registrant | About | **Filings** | Files | Relationship | Names | Topics | Web | All

**25 SEC Filings (from 12/21/06 to 3/31/08)**

*Email:* Send me notifications of all future filings involving MASTR Adjustable Rate Mortgages Trust 2007-1

*Most Recent:* 10-K — Annual Report — Form 10-K — for 12/31/07 — as Filer

List All Filings:   ☑ as Filer   ☑ as "Owner"   ☑ as "Issuer"   as Filing Agent

Find ____ in: recent filings ⧉   Show Filings with "hits" ⧉   and every "list" ⧉
Help   Wikipedia

#### Documents & Exhibits (as Filer or "Owner")

| Last Filing | Type | | Description | Documents |
|---|---|---|---|---|
| 3/31/08 | 10-K | Reports | Annual Report — Form 10-K — XBRL Reports & Workbooks | 1 |
| 8/9/07 | 8-K | Reports | Current Reports — Form 8-K | 7 |
| | | | · Bankruptcy or Receivership | |
| | | | · Financial Statements and Exhibits | |
| | | | · Other Events | |
| 1/25/08 | 15-15D | Reports | Notice of Suspension of Duty to File Reports — Form 15 | 1 |
| 1/8/08 | 10-D | Reports | Periodic Distribution Reports by Asset-Backed Issuers — Form 10-D | 12 |
| 1/10/07 | FWP | Registrations | Free Writing Prospectuses — Rule 163/433 | 2 |
| 1/19/07 | 424B3 | Registrations | Prospectus — Rule 424(b)(3) | 1 |
| 1/17/07 | 424B5 | Registrations | Prospectus — Rule 424(b)(5) | 1 |
| 3/31/08 | EX-34 | | Attestation Reports on Assessments of Compliance with Servicing Criteria for Asset-Backed Securities | 6 |
| 3/31/08 | EX-31 | | Certification per Sarbanes-Oxley Act (Section 302) | 1 |
| 1/12/07 | EX-23 | | Consent of Experts or Counsel | 1 |
| 1/31/07 | GRAPHIC | | Images and Pictures | 20 |
| 3/5/07 | EX-4 | | Instruments, Including Indentures, Defining the Rights of Security Holders | 7 |
| 1/31/07 | EX-99 | | Miscellaneous Exhibits, including Press Releases | 17 |
| 1/16/07 | EX-5 | | Opinion re: Legality | 1 |
| 3/31/08 | EX-33 | | Reports of Compliance with Servicing Criteria for Asset-Backed Securities | 6 |
| 3/31/08 | EX-35 | | Servicer Compliance Statements for Asset-Backed Securities | 3 |

#### Documents & Exhibits (as Subject Company or "Issuer")

| Last Filing | Type | | Description | Documents |
|---|---|---|---|---|
| 1/10/07 | FWP | Registrations | Free Writing Prospectuses — Rule 163/433 | 2 |
| 1/10/07 | GRAPHIC | | Images and Pictures | 11 |

## Securitization Participants Identified

| Original Lender | Original Loan Servicer: | Original Trustee: |
|---|---|---|
| AMERICAN HOME MORTGAGE CORP. d.b.a. AMERICAN BROKERS CONDUIT | AMERICAN HOME MORTGAGE SERVICING, INC. | UNITED CAPITAL TITLE COMPANY |
| Nominee for Lender/Beneficiary (In the Deed of Trust only): | Loan Originator and Seller | Loan Servicer (MBS Trust) |
| MORTGAGE ELECTRONIC REGISTRY SYSTEMS, INC. ("MERS") | AMERICAN HOME MORTGAGE CORP. | AMERICAN HOME MORTGAGE SERVICING, INC. *(Original Servicer)* HOMEWARD RESIDENTIAL, INC *(Current Servicer)* |
| Transferor | Depositor | Issuing Entity (The "MBS Trust") |
| UBS REAL ESTATE SECURITIES, INC. | MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC | **MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1** MORTGAGE LOAN PASS-THROUGH CERTIFICATES, SERIES 2007-1 |
| Trustee | Custodian | Master Servicer/Securities Adm. |
| U.S. BANK, N.A. | WELLS FARGO BANK, N.A. | WELLS FARGO BANK, N.A. |

**ISSUER TRUST NAME:**    MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1
**TITLE OF SERIES:**    MORTGAGE LOAN PASS-THROUGH CERTIFICATES, SERIES 2007-1
**Subject Loan Date:**    OCTOBER 06, 2006
**Cut-Off Date:**    DECEMBER 01, 2006
**Closing Date:**    JANUARY 16, 2007
**Distribution Date:**    25th of each month, beginning in January 2007
**Aggregate Principal Balance:**    $2,087,535,100.00 (Approximate as of Cut-Off Date per Prospectus Supp.)

Lawrence M. Asuncion - Copyright 2010-2012. All Rights Reserved.    Page 25 of 118

Simplified Flow Chart of a Proper Process of Securitization



Chart 8 - Simplified Flow Chart, Proper Securitization Process

**The *Prospectus Supplement [To Prospectus]***

* By cross-referencing of the terms and characteristics of the subject mortgage loan (*See Section I, Page 3 of this report – "Original Loan Transaction Summary" showing the terms and characteristics of the mortgage loan*) it led to a match within the range and parameters of the securitized mortgages, as described in *"Group I Loans "* tables *of the Prospectus Supplement* dated 1/16/2007 *(to Prospectus dated 10/17/2006)* filed on 1/17/2007 pursuant to SEC Rule 424(b)(5).

  *See **"Group I Loans"** tables, highlighted from <u>Page 154 to 158 of 299 Pages</u> of the Prospectus Supplement when downloaded and printed as a PDF file. The offering Prospectus Supplement [To Prospectus] is included in entirety and part of this audit and analysis report as **Exhibit "1."***

**The Pooling and Servicing Agreement (PSA)**

* The *Pooling and Servicing Agreement* (PSA) was among MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC. ("MASTR"), as *"Depositor"*; UBS REAL ESTATE SECURITIES, INC. ("UBS RES"), as *"Transferor"*; WELLS FARGO BANK, N.A.N ("WFB"), as "Master Servicer, Trust Administrator, and Custodian"; U.S. BANK NATIONAL ASSOCIATION ("U.S. BANK") in its capacity as *Trustee*."

* Pursuant to the PSA, securitization depositor warranted and represented that UBS RES is the owner of the Trust Fund (comprising of the securitized Mortgage Loans) that was irrevocably sold and conveyed to Trustee U.S. BANK in return for the Mortgage Pass-Through Certificates (collectively, the "Certificates"), which was issued in multiple classes, and which in the aggregate represented the entire beneficial ownership interest in the Mortgage Loans.

* The Trustee made an election and continuing qualification to treat the segregated pool of assets consisting of the Mortgage Loans and certain other related assets as a *real estate mortgage investment conduit* ("REMIC") pursuant to the Tax Code of 1986, as amended (the "Tax Code.")

* The PSA dated December 01, 2006, which is the governing operative contract that created the MBS Trust: MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1 (hereinafter MASTR ARM TRUST 2007-1), was filed with the Securities and Exchange Commission (SEC) on January 31, 2007 as Form 8-K EX 4.1. The PSA specified a *"Cut-Off Date"* on December 1, 2006 and a REMIC *"Startup Day"* (also referred to as the *"Closing Date"*) on January 16, 2007, pursuant to the Tax Code. The REMIC provisions of MASTR ARM TRUST 2007-1 mandate a *"true sale"* transaction (i.e., absolute sale of the Mortgage Loans without recourse) between Mortgage Loan Transferor, UBS RES and Depositor, MASTR, and from this Depositor to U.S. BANK, in its capacity as Trustee of the MASTR ARM TRUST 2007-1 (the "MBS Trust") for the benefit of the Certificateholders (Investors.) Depositor MASTR, concurrently with the execution of the PSA, irrevocably sold, transferred, assigned, set over and conveyed to U.S. BANK, as Trustee for the MBS Trust, <u>without recourse for the benefit of the Certificateholders all right, title and interest of the Depositor, including any security interest on all of and each Mortgage Loan identified on the *Mortgage Loan Schedule*.</u>

  *A true and correct PDF file copy (148 Pages) of the PSA in its entirety is included with this audit & analysis report as **Exhibit "2"***

Lawrence M. Asuncion - Copyright 2010-2012. All Rights Reserved.

**The Trust Agreement  (TA)**

* The *Trust Agreement* was among MASTR, as "Depositor"; U.S. BANK, as "Trustee"; and WEB, as "Trust Administrator."

* Pursuant to the TA, the Depositor, Trustee, and Trust Administrator entered into the Pooling and Servicing Agreement dated as of December 1, 2006 to create and establish the MASTR ARM TRUST 2007-1 (the "Underlying Trust.").

* The Underlying Trust has issued a series of certificates known as the Mortgage Pass-Through Certificates, Series 2007-1 (the "REMIC Classes"), evidencing beneficial interests in the Underlying Trust.

  *A true and correct PDF file copy (22 Pages) of the TA in its entirety is included with this audit & analysis report as **Exhibit "3."***

**The Mortgage Loan Purchase Agreement (MLPA)**

* The *Mortgage Loan Purchase Agreement* was among MASTR, as the "COMPANY" and UBS RES, as the "Seller."

* Pursuant to the MLPA, the Seller sold, transferred, assigned, and conveyed, and the COMPANY thereby purchased the mortgage loans (the "Mortgage Loans"), listed in Exhibit 1 of the PSA.

  *A true and correct PDF file copy (5 Pages) of the MLPA in its entirety is included with this audit & analysis report as **Exhibit "4."***

**The Master Loan Purchase and Servicing Agreement  (MLP&SA)**

* The *Master Loan Purchase and Servicing Agreement* was among UBS RES, as the "Initial Purchaser"; American Home Mortgage Corp. ("AHMC"), as the "Seller"; and American Home Mortgage Servicing, INC. ("AHMSI"), as the "Servicer."

* Pursuant to the MLP&SA, the Seller desires to sell, from time to time, to the Purchaser, and the Purchaser may purchase, from time to time, from the Seller, certain conventional fixed rate and adjustable rate residential first and second lien mortgage loans (the "Loans") as described on a servicing-retained basis, which shall be delivered in groups of whole loans on various dates as provided herein (each, a "Closing Date.")

* The Seller, simultaneously with the payment of the Purchase Price, executed and delivered to the Initial Purchaser an Assignment and Conveyance with respect to the related Loan Package in the form attached hereto as Exhibit 4. The Servicing File retained by the Servicer with respect to each Loan pursuant to this Agreement shall be appropriately identified in Servicer's computer system to reflect clearly the sale of such related Loan to the Purchaser. The Servicer shall release from its custody the contents of any Servicing File retained by it only in accordance with this Agreement, except when such release is required in connection with a repurchase of any such Loan.

* Exhibit 4 (*Assignment & Conveyance*) of the MLP&SA states, *"American Home Mortgage Corp. ("Seller") as the Seller under that certain Master Loan Purchase and Servicing Agreement, dated as of December 1, 2005 (the "Agreement") does hereby sell, transfer, assign, set over and convey*

to UBS Real Estate Securities Inc. as Purchaser under the Agreement, _without recourse,_ but subject to the terms of the Agreement, all rights, title and interest of the Seller in and to the Loans listed on the Loan Schedule attached hereto, together with the related Loan Files and all rights and obligations arising under the documents contained therein. Pursuant to Section 6.03 of the Agreement, _the Seller has delivered to the Custodian the documents for each Loan to be purchased as set forth in the Agreement._ The contents of each related Servicing File required to be retained by American Home Mortgage Servicing, Inc. (the "Servicer") to service the Loans pursuant to the Agreement and thus not delivered to the Purchaser are and shall be held in trust by the Servicer _for the benefit of the Purchaser as the owner thereof._ The Servicer's possession of any portion of each such Servicing File is at the will of the Purchaser for the sole purpose of facilitating servicing of the related Loan pursuant to the Agreement, and such retention and possession by the Servicer shall be in a custodial capacity only. _The ownership of each Note, Mortgage, and the contents of the Loan File and Servicing File is vested in the Purchaser and the ownership of all records and documents with respect to the related Loan prepared by or which come into the possession of the Seller or the Servicer shall immediately vest in the Purchaser and shall be retained and maintained, in trust, by the Servicer at the will of the Purchaser in such custodial capacity only._

_Each of the Seller and the Servicer Seller confirms to the Purchaser that the representation and warranties of the Seller and the Servicer set forth in the Agreement are true and correct as of the date hereof, and that all statements made in the Officer's Certificates of the Seller and the Servicer and all attachments thereto remain complete, true and correct in all respects as of the date hereof,_ and with respect to this Loan Package, the Seller makes the following additional representations and warranties, to the Purchaser, which representations and warranties are hereby incorporated into Section 7.02 of the Agreement."

- In addition, in connection with the assignment of any MERS Loan, _the Seller agrees that on or prior to each Closing Date it will cause, at its own expense, the MERS System to indicate that the related Loans have been assigned by the Seller to the Purchaser in accordance with this Agreement by including in such computer files the information required by the MERS System to identify the Purchaser as owner of such Loans._

_A true and correct PDF file copy (75 Pages) of the MLP&SA in its entirety is included with this audit & analysis report as **Exhibit "5."**_

## The Assignment, Assumption, and Recognition Agreement (AA&RA)

- The _Assignment, Assumption, and Recognition Agreement_ is among UBS RES, as (the "Assignor"), MASTR, as (the "Assignee"), AHMC as (the "COMPANY"), and AHMSI, as (the "Servicer.")

- The aforementioned parties entered into this agreement, it contains the promises and mutual covenants agreed to.

- In the AA&AR, Assignor UBS RES conveyed, sold, granted, transferred and assigned to Assignee MASTR all of the right, title and interest of UBS RES, in, to and under those Mortgage Loans listed on Exhibit A (the "Mortgage Loans") and (b) solely with respect to the servicing provisions as they relate to the Mortgage Loans, that certain Master Loan Purchase and Servicing Agreement dated

as of December 1, 2005, by and between Assignor, the Company and the Servicer and any related amendments thereto (the "Servicing Agreement"). For purposes of AA&AR, the term "Servicing Agreement" includes any separate bill of sale, letter, assignment and conveyance or other instrument pursuant to which Company and Assignor effectuated the purchase and sale of any Mortgage Loan following the execution and delivery of the Servicing Agreement.

*A true and correct PDF file copy (24 Pages) of the AA&RA in its entirety is included with this audit & analysis report as **Exhibit "6."***

• The *Mortgage Loan Schedule* (listed as *Schedule 1* of the PSA) is list of Mortgage Loans (as from time to time amended by the Custodian to reflect the addition of Eligible Substitute Mortgage Loans and the deletion of Deleted Mortgage Loans pursuant to the provisions of this PSA) transferred to the Trustee as part of the Trust Fund and subject to the PSA. This *Schedule I* includes the following information with respect to each Mortgage Loan: (1) the Mortgage Loan identifying number; (2) the Mortgagor's first and last name; (3) the street address of the Mortgaged Property including the city, state and zip code; (4) the original principal balance of the Mortgage Loan; (5) the Scheduled Principal Balance of the Mortgage Loan as of the close of business on the Cut-off Date; (6) the unpaid principal balance of the Mortgage Loan as of the close of business on the Cut-off Date; (7) the last scheduled Due Date on which a Scheduled Payment was applied to the Scheduled Principal Balance; (8) the last Due Date on which a Scheduled Payment was actually applied to the unpaid principal balance; (9) the Mortgage Rate in effect immediately following origination; (10) the Mortgage Rate in effect immediately following the Cut-off Date [if different from (9)]; (11) the amount of the Scheduled Payment at origination; (12) the amount of the Scheduled Payment as of the Cut-off Date (if different from (11)); (13) a code indicating whether the Mortgaged Property is owner occupied, a second home or an investor property; (14) a code indicating whether the Mortgaged Property is a single family residence, a two-family residence, a three-family residence, a four-family residence, a planned-unit development, a condominium or a Cooperative Unit; (15) a code indicating the loan purpose (i.e., purchase, rate/term refinance, cash-out refinance); (16) the stated maturity date; (17) the original months to maturity; (18) the remaining months to maturity from the Cut-off Date based on the original amortization Schedule and, if different, the remaining months to maturity expressed in the same manner but based on the actual amortization schedule; (19) the origination date of the Mortgage Loan; (20) the Loan-to-Value Ratio at origination; (21) the date on which the first Scheduled Payment was due on the Mortgage Loan after the origination date; (22) a code indicating the documentation style of the Mortgage Loan; (23) a code indicating if the Mortgage Loan is subject to a Primary Insurance Policy and, if so, the name of the Qualified Mortgage Insurer, the certificate number and the coverage amount of the Primary Insurance Policy; (24) the Servicing Fee Rate, and if such rate is subject to change, the date such rate will change and the Servicing Fee Rate applicable thereafter; (25) a code indicating whether the Mortgage Loan is subject to a prepayment penalty and, if so, the term of such prepayment penalty and whether the same shall be a Class I-P Prepayment Charge; (26) the credit score (or mortgage score) of the Mortgagor; (27) the debt-to-income ratio of the Mortgage Loan; (28) the next Adjustment Date; (29) the lifetime mortgage rate cap; (30) the Periodic Rate Cap; (31) the maximum interest rate; (32) the minimum interest rate; (33) [reserved]; (34) the date on which the Mortgage Loan was transferred to the Transferor; (35) a code indicating the Loan Group such