Mortgage Loan is included in; (36) the initial Servicer; (37) a code indicating the originator of the Mortgage Loan; (38) a code indicating whether the Mortgage Loan is a Cooperative Loan; (39) a code indicating the Custodian; and (40) a code indicating whether such Mortgage Loan is a Home Loan.

- Because the actual *Mortgage Loan Schedule* (in the Securitization Agreements) identifying the subject mortgage loan <u>was not filed with the SEC</u> and the fact that it was issued over 5 years ago, to re-verify that the mortgage loan in question was in fact sold by original lender AMRICAN HOME MORTGAGE CORP. ("AHMC") d.b.a. AMERICAN BROKERS CONDUIT ("ABC") and securitized into the MBS Trust: MASTR ARM TRUST 2007-1, CSA utilized *Bloomberg Pofessional's* proprietary securitized mortgages database to identify and confirm <u>if in fact the subject mortgage loan was listed and still represented as part of the Trust Fund</u> backing the certificates issued by the MBS Trust to its certificateholders (investors).

- **CSA's verification using the Bloomberg database located and specifically identified the subject mortgage loan from the current Mortgage Loans listing of the MBS Trust under Trust ID/Loan Number 000100436.** <u>CSA's audit therefore verified with 100% accuracy that the subject mortgage loan was in fact sold and securitized into the</u> MASTR ARM TRUST 2007-1 <u>on or before the Trust's "Closing Date" (also REMIC's "Start Day") on</u> January 16, 2007.

*Included and part of this audit and analysis report as **Exhibit "7"** is a true and correct copy of the specific screen printouts from the Bloomberg's database of securitized mortgages for **MASTR ARM TRUST 2007-1**.  Also shown below are the relevant screenshots from Bloomberg's database showing the subject mortgage loan listed as loan # 0001400436. <u>**This was also the original loan number of the subject mortgage loan at origination on October 06, 2006.**</u>*







Lawrence M. Asuncion - Copyright 2010-2012. All Rights Reserved.





Lawrence M. Asuncion - Copyright 2010-2012. All Rights Reserved.









Lawrence M. Asuncion - Copyright 2010-2012. All Rights Reserved.

**Bloomberg Screen 1:**

Analyze Agency CMO Menu    MARM 2007-1 IIA Mtge    CIC

Page
CLCG <Go> for graphical display      50 <Go> for alternate group.

## Collateral Composition   Page 1 of 16 (SUM)
### MARM 2007 1   Group 1: G1 1

ARM Stats (page 11)          % Balance as of Jun 2012

| Loan Purpose | CURRENT / ISSUED Jun 2012/Dec 2006 | Occupancy | CURRENT / ISSUED Jun 2012/Dec 2006 |
|---|---|---|---|
| Purchase | 15.3 / 15.1 | Owner occ | 54.1 / 55.7 |
| Equity Take Out | 63.8 / 61.3 | Vacation | 8.6 / 10.6 |
| Refinance | 20.8 / 23.5 | Investment | 37.3 / 33.7 |
| **Mortgaged Properties** | | **Origination Year** ( See HELP ) | |
| Single Family | 56.3 / 58.3 | 2006 | 99.6 / 99.8 |
| 2-4 Family | 14.2 / 10.4 | 2005 | 0.4 / 0.2 |
| Condominium | 11.1 / 11.8 | 2004 | - / - |
| PUD | 18.4 / 19.3 | 2003 | - / - |
| **Amortization Term** | | **Amortization Type** | |
| 40 Year | 50.7 / 52.2 | Level FRM | - / - |
| 30 Year | 49.3 / 47.8 | ARM | 100.0 /100.0 |
| Balloon | - / - | Non-Level FRM | - / - |
| **Quartiles (current)** | | **Miscellaneous** | |
| WAM 280-293 | WAC 2.00- 3.25 | Northern CA | 14.1 / 18.5 |
| 293-293 | 3.25- 3.60 | Southern CA | 16.5 / 16.5 |
| 293-413 | 3.60- 4.00 | LTV>80% Uninsured | na / na |
| 413-451 | 4.00- 7.88 | LTV>90% Uninsured | na / na |

**Bloomberg Screen 2:**

Analyze Agency CMO Menu    MARM 2007-1 IIA Mtge    CIC

Backpage
CLCG <Go> for graphical display      50 <Go> for alternate group.

## Collateral Composition   Page 13 of 16 (NEGAM)
### MARM 2007 1   Group 1: G1 1

100.0% ARM         Arm Program & Neg-Am Profile as of Jun'12

| ARM Loan Program | #Loans | $Bal(MM) | % Balance | WAC | WaLTV | WaFICO | WaRst |
|---|---|---|---|---|---|---|---|
| Option Arm | 641 | 163.90 | 87.63 | 3.43 | 83 | 722 | Jun12 |
| 10/20 | 84 | 23.13 | 12.37 | 5.64 | 87 | 734 | Sep16 |

**Payment Distribution (Neg-Am Only)    WA Months to Payment Reset: 6 (Dec 12)**

| | Aug12 | Oct12 | Nov12 | Dec12 | Jan13 |
|---|---|---|---|---|---|
| InitCpn | 2.50 | 1.67 | 1.56 | 1.45 | 1.57 |
| WAC | 4.09 | 3.33 | 3.37 | 3.44 | 2.92 |
| Margin | 3.94 | 3.47 | 3.61 | 3.55 | 3.91 |
| %Coll | 0.07 | 1.79 | 6.25 | 78.20 | 1.33 |

| | | Neg-Am Limit | #Loan | $Bal(MM) | %Bal |
|---|---|---|---|---|---|
| %Bal of Loans > Orig Face | 78.24 | 125 | 489 | 124.36 | 66.49 |
| $Bal(MM) of Loans > Orig Face | 146.34 | 110 | 152 | 39.54 | 21.14 |
| # Of Loans > Orig Face | 539 | | | | |

| | | WALTV | WA Cr Score | WA Curr Ln Size |
|---|---|---|---|---|
| Quartile of | 100.01 - 104.36 | 79 | 729 | 263,041 |
| Loans Above | 104.38 - 107.40 | 83 | 723 | 320,589 |
| Orig. Face | 107.43 - 110.92 | 84 | 719 | 324,594 |
| | 110.94 - 133.04 | 88 | 715 | 339,652 |



## The Feeding Frenzy Period for Mortgage Securitization (2002-2008)

2002 saw the beginning of full-scale securitization. Wall Street had need for the income from the guaranteed income streams generated by securitization. The government had the need for the stimulus created by housing. Lenders had the need for the money to lend that came from Wall Street.

From 2002 up to early 2008, the need to feed Wall Street kept growing. By early 2004, qualified borrowers no longer existed, so the lenders loosened standards for lending. No matter what, the demand for Mortgage Backed Securities continued. Eventually, almost anyone could qualify for a loan. During this period of time, the Government knew what was happening, but they could do nothing about it. To restrict lending would result in recession and a revealing of the underlying weakness of the economy. So the Fed allowed the charade to continue. By mid 2006, the strains were showing. Defaults were increasing. Home values in certain parts of the country were falling precipitously, and especially so, in areas like Florida. At the end of 2006, the first Sub-Prime lenders were closing. This trend would continue throughout 2007 until early part of 2008, at which period the Housing Bubble burst.

The "reality" of the securitization process became different than what was originally enunciated.

Funding for the loans generally came from the Wall Street firm that was organizing the transaction. Investment banking firms provided money in the form of "Warehouse Lines of Credit" for each "lender" to use. The funds for the Warehouse Lines of Credit came mostly from two different sources.

- The Wall Street Firm, if large enough, could provide the money from its own accounts initially, but this was a practice that was not commonly used.

- The Wall Street firm "pre-sold" the Trust, selling the idea to other firms who put up the money and who then would be involved in different parts of the transaction such as typically selling the certificates and bonds to private investors.

The "originating" lenders were provided the funds from the Warehouse Lines of Credit, and most of them just became "Table Lenders." The lender was tasked with finding borrowers for the money. Lending underwriting standards were compromised and the deal was to facilitate and close as many mortgage loans possible because each trust had a certain time frame in which the money could be lent to borrowers, allowing the Trust to sell the Certificates and Bonds. As a result, almost anyone of legal age could "qualify" for some type of loan.

## The Subverted Securitization Process

```
┌─────────────────────┐         ┌─────────────────────┐
│     Originator       │         │       Issuer         │
│  AMERICAN BROKERS    │ ──────▶ │ MASTR ADJUSTABLE RATE│
│     CONDUIT          │         │ MORTGAGES TRUST 2007-1│
└─────────────────────┘         │  MORTGAGE LOAN PASS- │
                                │ THROUGH CERTIFICATES,│
        ┌─────────────────────┐ │     SERIES 2007-1    │
        │      Depositor      │ └─────────────────────┘
        │  MORTGAGE ASSET     │
┌─────────────────────┐│ SECURITIZATION, INC.│
│  Sponsor/Transferor  │└─────────────────────┘
│  UBS REAL ESTATE     │
│  SECURITIES, INC.    │ ┌─────────────────────┐
└─────────────────────┘ │     TRUE SALE        │
                        │ 1. Legal Opinions    │
                        │ 2. Asset Purchase/Sale│
                        │    Agreements        │
                        │ 3. Delivery & Acceptance│
                        │    Receipts          │
                        │ 4. Compensation/Money│
                        │ 5. Capacity of parties to Buy│
                        │    and Sell          │
                        └─────────────────────┘
```

Chart 9 – Simplified Flow Chart, Securitization Process Undermined

With the frenzy to securitize as many loans possible within the short time frame, the entire lawful process of Securitization was entirely undermined. The assignment of the Deed of Trust and the actual transfer of the original promissory Note, both of which instruments are required for each entity transfer was bypassed.

## The Legal Issues

Below are the significant legal issues when the proper securitization process was undermined:

- When the loan was sold to each entity, there were no Assignments of the Deed of Trust to any entity at the time of the sale. Therefore, "True Sales" could not occur despite them being required a perfected "Chain of Title" by the Pooling and Servicing Agreements (pa) though the Agreements provide "allowances" for MERS loans.

- The Sponsor and the Depositor were "formed" having no assets.  Therefore, these entities were unable to "buy" or "sell" the loans for "True Sales" to occur.

- The selling of the loans from the lender to the Wall Street entity did not in fact occur. The Wall Street entity who created the Warehouse Line of Credit was in fact the "True Lender."

- The Originator of the loan simply funded (by name) from the "Warehouse Line" and simply acted as a "Table Funder".

- Again, no "True Sales" ever occurred, and as a result, there are questions as to the legality of

the Trusts.

- No Assignments of Beneficiary or Endorsements of the Note to all entities in the transaction ever occurred, reinforcing the argument of no "True Sales" ever occurring. The endorsements are a requirement of the Pooling and Servicing Agreement.

- An Assignment of Beneficiary from the original lender only occurs upon default, and almost always after the Notice of Default is filed, which would mean that the Notice of Default might have defects in it.

- The Assignments of Beneficiary are being made to the Servicer and not the Trust, which would pose new issues for foreclosure because the Trust is not receiving the Deed despite the Trust's being the "beneficial interest" in the Note.

- The addition of MERS to the equation, as "Nominee for the Beneficiary" to get around the requirement of assigning Deeds of Trust, further "muddies the waters" of the transaction. Many courts are ruling that MERS has no ability to foreclose or make assignments, with Chase and EMC in 2007 and Washington Mutual in 2008 ceasing use of MERS in foreclosures. Most recently, as of May 1, 2010, MERS cannot be named as a plaintiff in any foreclosure action on a mortgage loan owned or securitized by Fannie Mae.

## Subverted Securitization Process/Transaction Flow Chart



**Chart 10: Flow Chart Showing Subverted Mortgage Securitization Process**

Lawrence M. Asuncion - Copyright 2010-2012. All Rights Reserved.          Page 41 of 118

## Role of the Loan Servicer

Once a loan has been funded, servicing of the loan is the key element from that point. Servicing refers to the collection of the monthly payments for each mortgage.

Every Pooling and Servicing Agreement (pa) names a Master Servicer and other Servicers. They are the entities tasked with the collection of payments. Responsibilities include:

- Collect the monthly payments on each loan
- Keep accurate payment history records
- Track payments and segregate the different Trusts for which the servicer collects
- Make monthly payments to the Trusts
- Engage in Collection Efforts for loans not being repaid
- Attempt to resolve Collection Issues via loan modifications, forbearance, or other workout agreement tactics
- Authorize Short Sales or Deed in Lieu of Foreclosure
- Initiate Foreclosure Proceedings

## The Servicing Process Flow Chart



Chart 11 – Simplified Flow Chart, Loan Servicing Process

Lawrence M. Asuncion - Copyright 2010-2012. All Rights Reserved.

The Servicer has main duties related to loan management. It would appear that there would be good and beneficial reason to engage in loan modifications or principal reductions to ensure loan repayment over foreclosures.

But in reality, the Servicer has no incentive to engage in such accommodation of the defaulting borrower because of the following reasons:

- The Servicer has no true beneficial interest in the Note, so there is no urgent demand for anything but foreclosure.

- The Servicer must "advance" the payments from the Trust with its own funds when payments are missed. This advances will normally be for six months or more than a year. Pursuant to the terms of a typical PSA regarding borrower's missed payments, the only way to recoup these funds is through foreclosure. The PSA do not allow for recoupment in any other manner. The Servicer can only avoid making these advances only when it is determined that the money is "not recoverable."

- Servicers are paid on the total dollar amount of the Trust's "Servicing Portfolio." Authorizing a principal reduction would decrease the amount of the Portfolio, so the Servicer would receive less monthly income as a result. A percentage payment on the unpaid principal balance of the pool is the single largest source of income for Servicers.

- Servicers collect additional fees from late payments, foreclosure actions, and numerous "other fees" that they add to the homeowner's account.

- Stalling foreclosures means that the "Servicing Portfolio" increases monthly, resulting in increased Servicing Fees.

- Most PSAs do not allow for modification unless the Servicer "buys back" the loan from the Investor at full amount of balance due. The Servicer would not do that since the loan is in default and the home is most likely worth less than the loan.  To buy back the loan would result in a loss for the Servicer.

- Primary Mortgage Insurance on a loan means no losses occur in the event of foreclosure.

- Credit Default Swaps would pay not just losses, but above and beyond losses.  Using these forms of insurance, for example, a $2 premium can be paid to insure $100 in debt.

These are some of the important reasons why the Servicers are not engaging in loan modifications despite their being quite able to offer modifications in many instances. (This reasoning also applies to Fannie Mae and Freddie Mac loans.).

# SECTION III: FORECLOSURE PROCESS REVIEW

## Chain of Title Review

| RECORDED CHAIN OF MORTGAGE/ DEED POSSESION | | CHAIN OF NOTE POSSESSION | |
|---|---|---|---|
| **DATE** | **BENEFICIARY** | **DATE** | **NOTE HOLDER** |
| 10/06/2006<br><br><br><br><br><br><br>Recorded on 10/13/2006 | **DEED OF TRUST ("DOT")**<br>**AMERICAN BROKERS CONDUIT as Lender;**<br>**UNITED CAPITAL TITLE COMPANY as Trustee; and**<br>**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") as Lender's Nominee and Beneficiary under the DOT**<br>**[MIN: 1000242-0001400436-6]**<br>*Recorded as instrument # 2006091088 in the official records of the Monterey County Recorder (CA)* | 10/06/2006 | AMERICAN BROKERS CONDUIT as Lender |
| 3/10/2010<br><br><br><br>Notarized on 4/14/2010<br><br>Recorded on 7/06/2010 | **ASSIGNMENT OF DEED OF TRUST**<br>by MERS as Nominee for Lender<br>Granting, Assigning and Transferring the Mortgage to<br>AMERICAN HOME MORTGAGE SEVICING, INC. ("AHMSI")<br><br>*(Signed by Andrew Fuerstenberger, VP and Kathy Smith, Assistant Secretary for MERS; Notarized by Sonya F. Williams)*<br><br>*Recorded as Instrument # 2010036877 in the official records of the Monterey County Recorder (CA* | UNKNOWN | UNKNOWN |
| 3/12/2010<br><br><br><br><br><br><br><br>Notarized on 3/29/2010<br><br>Recorded on 4/29/2010 | **SUBSTITUTION OF TRUSTEE ("SOT")**<br>Issued by AHMSI as Agent for U.S. BANK NATIONAL ASSOCIATION, as Trustee for MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-1.<br><br>SOT Instrument purports to substitute<br>UNITED CAPITAL TITLE COMPANY to<br>POWER DEFAULT SERVICES, INC.<br>*(Signed by Theresa Esposito, VP and Carolyn White, Assistant VP for AHMSI; Notarized by Sonya F. Williams)*<br><br>*Recorded as instrument #2010023921 in the official records of the Monterey County Recorder (CA)* | UNKNOWN | UNKNOWN |

Lawrence M. Asuncion - Copyright 2010-2012. All Rights Reserved.

| | | | |
|---|---|---|---|
| 3/17/2010<br><br>Notarized on<br>4/15/2010<br><br>Recorded on<br>7/06/2010 | **ASSIGNMENT OF DEED OF TRUST**<br>by AHMSI to<br>U.S. BANK NATIONAL ASSOCIATION, as Trustee for MASTR<br>ADJUSTABLE RATE MORTGAGES TRUST 2007-1,<br>MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-1.<br><br>*(Signed by Andrew Fuerstenberger, VP and Kathy Smith,*<br>*Assistant Secretary for AHMSI; Notarized by Sonya F. Williams)*<br><br>*Recorded as Instrument # 2010036878 in the official records of the*<br>*Monterey County Recorder (CA* | UNKNOWN | UNKNOWN |
| 3/24/2010<br><br><br><br>Recorded on<br>3/25/2010 | **NOTICE OF DEFAULT ("NOD")**<br>issued by SERVICELINK as Agent for TD SERVICE<br>COMPANY, as Authorized Agent for the Beneficiary<br>*(Signed by Liz Caldera)*<br><br>*Recorded as Instrument # 2010016821 in the official records of the*<br>*Monterey County Recorder (CA)* | UNKNOWN | UNKNOWN |
| Dated<br>6/26/2010<br><br><br><br><br><br>Recorded on<br>6/25/2010 | **NOTICE OF TRUSTEE'S SALE ("NOTS")**<br>issued by TD SERVICE COMPANY,<br>*as Agent for purported Substitute Trustee* POWER<br>DEFAULT SERVICES, INC. and as Authorized Agent for<br>the Beneficiary<br><br>*(Signed by Kimberly Thorne, Assistant Secretary*<br>*for T.D. SERVICE COMPANY)*<br><br>*Recorded as Instrument # 2010035089 in the official records of the*<br>*Monterey County Recorder (CA)* | UNKNOWN | UNKNOWN |
| 7/29/2010<br><br><br><br><br><br>Recorded on<br>8/03/2010 | **NOTICE OF RECISSION**<br>of Declaration of Default and Demand for Sale and<br>Notice of Default and Election to Sell<br><br>issued by T.D. SERVICE COMPANY as agent for purported<br>Substituted Trustee, POWER DEFAULT SERVICES, INC.<br><br>*(Signed by Kimberly Thorne, Assistant Secretary for*<br>*T.D. SERVICE COMPANY)*<br><br>*Recorded as Instrument # 2010042477 in the official records of the*<br>*Monterey County Recorder (CA)* | UNKNOWN | UNKNOWN |

**IMPORTANT NOTE:** The above chain of title review of the property on July 19, 2012 from the official records of the

Monterey County <u>does not show any Assignment of the Deed of Trust</u> from original lender AMERICAN BROKERS CONDUIT ("ABC") to any entity. However, there are (2) Assignments of Deed of Trust ("DOT"). The first mortgage assignment dated 3/10/2010 (not recorded until 7/06/2010) that was from original nominee beneficiary MERS to AMERICAN HOME MORTGAGE SERVICING, INC. ("AHMSI"), which is Servicer for MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1 ("MASTR ARM TRUST 2007-1"), then a second Assignment of DOT dated 3/17/2010 (not recorded until 7/06/2010) that was from AHMSI directly to U.S. BANK NATIONAL ASSOCIATION ("U.S. BANK"), as Trustee for MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-1.

However, pursuant to the governing PSA and based on the trust laws of the state of New York which governs the PSA, these were invalid mortgage assignments (more so without the underlying original note) to the Servicer and then directly to the Trust. Both (DOT) assignments were over three (3) years past the Trust's Closing Date on 1/16/2007. The Assignment of DOT issued by MERS, who is without valid authority and <u>no longer the present Beneficiary in the DOT</u> because the mortgage loan was long sold by the Lender in December 2006, is invalid and fraudulent. Since this first mortgage assignment from MERS to AHMSI is null and void, it would make any subsequent assignment by the assignee AHMSI, as an assignor to U.S. BANK, null and void as well. According to the binding PSA, only securitization Depositor MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC. ("MASTR"), and no other, may transfer a mortgage loan to the MBS Trust <u>within the closing date</u>. Furthermore, any <u>assignment of a mortgage loan (consisting of the original note and DOT) after the MBS Trust's Closing Date on 1/16/2007 (as in this instant case), is considered a *prohibited transaction* (an "Adverse REMIC Event") pursuant to the Tax Code of 1986, and is strictly not allowed under the REMIC provisions of the PSA.</u>

## Mortgage Loan Documents and Foreclosure Process Review

The chain of title on the subject mortgage was reviewed in chronological order of execution (signing and notarization, as applicable) as it relates to a foreclosure process. The borrower (mortgagor) provided the following mortgage loan related documents:

- The **Promissory Note** ("**Note**") dated October 06, 2006 with AMERICAN BROKERS CONDUIT as Lender. *A true and correct copy the "Note" is included as Exhibit "A" and incorporated by reference as though fully set forth herein.*

- The **Deed of Trust** ("**DOT**") that was executed by the borrowers (Trustors) on October 06, 2006 with ABC as Lender; UNITED CAPITAL TITLE COMPANY (hereinafter "UNITED CAPITAL") as mortgage trustee; and MERS as nominee for ABC and Beneficiary under the DOT. However, <u>MERS was not referenced in the mortgage Promissory Note in any capacity</u>. The mortgage was assigned a MERS' mortgage identification number ("MIN"): 1000242-0001400436-6. The DOT was recorded on October 13, 2006 as Instrument No. 2006091088 in the official records of the Monterey County Recorder (CA). *A true and correct copy the "DOT" is included as Exhibit "B" hereto and incorporated by reference as though fully set forth herein.*

- An **Assignment of Deed of Trust (the "1st Assignment of DOT")** dated March 10, 2010 (<u>but not notarized until on April 14, 2010</u>) that was issued by MERS and signed by *Andrew Fuerstenberger*, as its Vice President and *Kathy Smith*, as its Assistant Secretary, which purports to grant, assign and transfer all beneficial interest under the DOT to AMERICAN HOME MORTGAGE SERVICING, INC. ("AHMSI.") This mortgage assignment <u>was not recorded</u>

<u>until July 06, 2010</u> as Instrument No. 2010036877 in the official records of the county recorder. *A true and correct copy the "1ˢᵗ Assignment of DOT" is included as Exhibit "C" hereto and incorporated by reference as though fully set forth herein.*

* A **Substitution of Trustee** ("**SOT**") dated March 12, 2010 (<u>but not notarized until March 29, 2010</u>) that was issued by AHMSI, which purports to substitute original Trustee UNITED CAPITAL TITLE COMPANY for a new Trustee, POWER DEFAULT SERVICES, INC. *Theresa Esposito*, as Vice President, and *Carolyn White*, as Assistant Vice President of AHMSI, signed this SOT instrument and subsequently recorded it on April 29, 2010 as Instrument No. 2010023921 in the official records of the county recorder. *A true and correct copy the "SOT" is included as Exhibit "D" hereto and incorporated by reference as though fully set forth herein.*

* Another **Assignment of Deed of Trust** (the "**2ⁿᵈ Assignment of DOT**") dated March 17, 2010 (but not notarized until April 15, 2010) that was issued by AHMSI and signed by *Andrew Fuerstenberger*, as its Vice President and *Kathy Smith*, as its Assistant Secretary, which purports to grant, assign and transfer all beneficial interest under the DOT to U.S. BANK NATIONAL ASSOCIATION, as TRUSTEE for MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1 ("MASTR ARM TRUST 2007-1.") This 2ⁿᵈ mortgage assignment was recorded as Instrument No. 2010036878 in the official records of the county recorder simultaneously with the first assignment (by MERS to AHMSI) on July 06,2010. *A true and correct copy the "2nd Assignment of DOT" is included as Exhibit "E" hereto and incorporated by reference as though fully set forth herein.*

* A **Notice of Default and Election to Sell Under Deed of Trust** ("**NOD**") dated March 24, 2010 that was <u>issued by SERVICELINK, as Agent for "T.D. SERVICE COMPANY, AS AUTHORIZED AGENT FOR THE BENEFICIARY."</u> This NOD was signed by *Liz Caldera* and subsequently recorded on March 25, 2010 in the official records of the Monterey County Recorder (CA) as Instrument No. 2010016821. *A true and correct copy the "NOD" is included as Exhibit "F" hereto and incorporated by reference as though fully set forth herein.*

* A **Notice of Trustee's Sale** ("**NoTS**") dated June 26, 2010 that was issued by T.D. SERVICE COMPANY as Agent for purported "<u>Trustee POWER DEFAULT SERVICES, INC. and as Authorized Agent for the Beneficiary</u>." This NoTS, which was signed by *Kimberly Thorne*, Assistant Secretary for T.D. SERVICE COMPANY, <u>DOES NOT specifically name the present "Beneficiary" in the mortgage</u>. The NOTS was recorded on June 25,2010 as Instrument No. 2010035089 in the official records of the county recorder. *A true and correct copy the "NoTS" is included as Exhibit "G" hereto and incorporated by reference as though fully set forth herein.*

* A **Notice of Rescission** ("**NOR**") dated July 29, 2010 that was issued by T.D. SERVICE COMPANY as Agent for purported substitute Trustee POWER DEFAULT SERVICES, INC. This NOR instrument was signed by *Kimberly Thorne*, Assistant Secretary for T.D. SERVICE COMPANY and was recorded on August 03,2010 as Instrument No. 2010042477 in the official records of the Monterey County Recorder. *A true and correct copy the "NOR" is included as Exhibit "H" hereto and incorporated by reference as though fully set forth herein.*

---

**About MERS' and AHMSI Signers Andrew Fuerstenberger and Kathy Smith**

It should be noted that the purported signing officers for MERS and AHMSI on both *Assignments of DOT* (Exhibit "C" and "E", respectively) were *Andrew Fuerstenberger and Kathy Smith*, allegedly well-known "*Robo-signers.*" Researched public information from the Internet uncovered that *Andrew Fuerstenberger and Kathy Smith,* are not employees of MERS; they are in fact employees of AHMSI. *Mr. Fuerstenberger's* holds the title of Assistant Vice President - Foreclosure at AHMSI. He is a known signer of mortgage assignments, trustee substitutions and foreclosure notices for MERS, as well as for different mortgage loan servicing and bank entities. Further research on the Internet for the name *Kathy Smith*, it was found that *Ms. Smith* is also known to sign mortgage assignments, trustee substitutions, and foreclosure notices not only for MERS and AHMSI, but also for *Sand Canyon Corporation*. *Ms. Smith* has also used various job titles for other Banking and Mortgage Loan entities as well. (*See attached as* **Exhibit "I"**, *a true and correct printout re* Hawaii Bank Fraud RE Tehiva/Phillips Foreclosure Eviction *from the website of"* 4closurefraud.org", *popular a consumer advocacy group.*

Below is a screenshot taken from the business-networking web site of "*LinkedIn.com*," where *Andrew Fuerstenberger's* business profile was found, and an "Approved Robo-signers List" (next page) from *McDonnell Property Analytics* on the web publications site *Scribd.com*, where the names *Andrew Fuerstenberger, Kathy Smith, Theresa Esposito* also appear as alleged "*robo-signers."* All were signers of the recorded mortgage instruments pertaining to the subject mortgage loan and subsequent foreclosure action.





**Scribd.**

"signatures of andrew fuerstenberger"    Search    Explore ▸

3.0% No Closing Cost Refi

No Closing Cost APR Refi. Quote As Seen on CNN News. Call Today!
GreenlightLoans.com/866.557.6024

## McDonnell Property Analytics Approved Robo-signers List

| LAST NAME | FIRST NAME | LAST NAME | FIRST NAME |
|---|---|---|---|
| ADAMS | MURIEL | KENNERTY | JOHN HERMAN |
| AGUILAR GREENE | ANGELA | KINGSTON | PAT |
| ALAGIC | SANELA | KIST | MARY |
| ALLEN | CHRISTINA | KNOWLES | RITA |
| ALLOTEY | LIOUENDA | KOCH | BILL |
| ANDERSON | EARITHA | KOWAL | VICTORIA |
| ANDERSON | SCOTT | LEETE | JESSICA |
| BAGGS | LORAINE | MARTINEZ | KIM |
| BAGLEY | BRENT | MCGOWAN | MARY JO |
| BAILEY | KIRSTEN | MOORE | CRYSTAL |
| BAILEY-SLYH | MARTHA | NADEAU | MICHAEL |
| BALDWIN | CHRISTIE | NOLAN | ANGELA |
| BELL | LANCE | NOLAN | FRANCIS |
| BLACKSTUN | NATE | NORD III | HAROLD |
| BLY | BRYAN | NORIEGA | MARTI |
| BOLDUC | LORI | OHDE | JESSICA |
| BROWN | CHINA | PEREZ | DAVID |
| BROWN | TRACEY | PETERSON | ELENA |
| BURTON | LINDA | PHIDAVANH | VIENGMOR |
| COLSTON | NORIKO | PIRRITANO | LAURA |
| COOK | MARY | PORTER | KIMBERLY |
| COOK | WHITNEY K. | PRICE | TAMARA |
| COTTRELL | BETH | PRINDLE | MICHAEL |
| COTTRELL | JOHN | RIVERA | SILENA |
| CROFT | TOM | RYBARCZYK | ROBERT |
| DALTON | MARGARET | SCHLEPPY | GREG |
| DOCX | | SEIDEL | KEITH |
| ESPOSITO | THERESA | SMITH | KATHY |
| FUERSTENBERGER | ANDREW | SPOHN | STACY E. |
| GORLEWSKI | CATHERINE M. | STEPHAN | JEFFREY |
| GREEN | LINDA | THOMAS | CHERYL |
| GREEN | MICHELLE | THOMAS | TAWANNA |
| HALYARD | MICHELLE | THORESEN | LINDA |
| HARMON | ANDREW | TURNER | TIAQUANDA |
| HARP | KORELL | VIVEROS | MELISSA |

**MERS' Assignment of DOT, a direct violation of the governing Pooling and Servicing Agreement ("PSA")**

CSA's investigation and forensic audit verified with 100% accuracy that the subject mortgage loan had already been long sold (on or before a "Cut-off Date" on December 1, 2006) by AMERICAN HOME MORTGAGE CORP. ("AHMC"), as "Originator" to UBS REAL ESTATE SECURITIES, INC. ("UBS RES"), the mortgage loan "Transferor" and "Sponsor" in a securitization transaction. Thereafter, UBS RES irrevocably sold the loan to securitization "Depositor" MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC. ("MASTR"). With other mortgages in a pool, this Depositor represented, warranted and covenanted that MASTR irrevocably sold the subject mortgage loan to the MBS Trust: MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1 ("MASTR ARM TRUST 2007-1") on or before its "Closing Date" on January 16, 2007. Pursuant to the clear and precise terms of the PSA, only the Depositor, and no other, may sell and transfer mortgages to U.S. BANK, as Trustee for the benefit of the Certificateholders of the BAYVIEW FINANCIAL MORTGAGE PASS-THROUGH TRUST 2007-A. This was necessary and in accordance with the Tax Code of 1986 to preserve and maintain the separation and "*bankruptcy remoteness*" of the originating loan seller and the MBS TRUST.

However, MERS, as nominee beneficiary of original lender AMERICAN BROKERS CONDUIT ("ABC") and Beneficiary in the Deed of Trust (at loan origination), purports to assign the mortgage (DOT) on March 10,2010 to AMERICAN HOME MORTGAGE SERVICING, INC. ("AHMSI"), a wholly-owned loan servicing company of AMERICAN HOME MORTGAGE CORPORATION ("AHMC"). AHMSI is not a party to the original loan transaction at origination of the mortgage on October 6, 2006, and certainly not the loan originator, sponsor, depositor or trustee of the MBS Trust in the securitization transaction on December 2006 (Trust's Cut-off Date).

First, this mortgage assignment was without any legal force and effect without the indorsement of underlying original mortgage note. Second, the subject mortgage loan (consisting of the original note and the DOT) was already sold by lender AMERICAN BROKERS CONDUIT (under its legal name AMERICAN HOME MORTGAGE CORP.) over 3 years earlier. Pursuant to the MLPA and the PSA, AMERICAN HOME MORTGAGE CORP. was paid for the full balance of the mortgage loan when it was securitized in December 2006. The terms and REMIC provisions of the governing PSA do not have any provision whatsoever for MERS to re-sell any of the securitized mortgage loans in the pool.

MERS does not have such authority under the precise and clear terms of the PSA, and MERS cannot claim it was acting as an authorized agent or nominee of the Trustee of the MBS Trust. U.S. BANK as Trustee of the MASTR ARM TRUST 2007-1 cannot make such appointment of MERS as its agent or nominee because the MBS Trust never received a valid assignment and transfer of the subject mortgage loan. The chain of title of the property was broken when the original lender AMERICAN BROKERS CONDUIT (under its legal name AMERICAN HOME MORTGAGE CORP.) sold the mortgage loan but failed to assign the mortgage (DOT) and transfer/indorse the original note to securitization Sponsor/Transferor UBS RES, and therefore UBS RES could not and DID NOT assign and transfer the mortgage loan to securitization Depositor MASTR. Because such intervening assignment and transfer never

occurred as verified from the official records of the county recorder, Depositor MASTR could not and DID NOT validly assign and transfer the subject loan to U.S. BANK, as Trustee of the MASTR ARM TRUST 2007-1. The failed securitization irreversibly clouded the title of the property, to the detriment of the mortgagors (borrowers).

## Agency Relationship of MERS as Nominee (Agent) with its Principal (Lender)

In addition to the willful violation of the REMIC provisions of the PSA, there is a legal question whether MERS, as the original lender's (AMERICAN BROKERS CONDUIT) nominee in the DOT at loan origination on October 06, 2006, was authorized by AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP.), its principal on record, to assign the subject mortgage (DOT) to AHMSI. This was not possible because on the date the assignment of the mortgage by MERS to AHMSI was signed and March 10, 2010, AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP.) was no longer an operating entity. This is an incontrovertible fact. Below is a screenshot from the California Secretary of State website which shows the entity "AMERICAN BROKERS CONDUIT" as having NO RECORD FOUND.



The word "nominee" is defined as "[a] person designated to act in place of another, in a very limited way" or "[a] party who holds bare legal title for the benefit of others." (*Black's Law Dictionary* 1076 [8th ed. 2004]). Such definition suggests that a nominee possesses few or no legally enforceable rights beyond those of a principal whom the nominee serves." (*Landmark National Bank v Kesler, 289 Kan 528, 538 [2009]*). The Supreme Court of Kansas, in *Landmark National Bank, 289 Kan at 539*, observed that: The legal status of a nominee, then, depends on the context of the relationship of the nominee to its principal. Various courts have interpreted the relationship of MERS and the lender as an agency relationship. See in re *Sheridan, 2009 WL631355, at *4 (Bankr. D. Idaho, March 12, 2009)* (MERS "acts not on its own account. Its capacity is representative."); *Mortgage Elec. Registrations Systems, Inc. v Southwest, 2009 Ark. 152 ___, ___SW3d___, 2009 WL 723182 (March 19, 2009)* ("MERS, by the terms of the deed of trust, and its own stated purposes, was the lender's agent"); *La Salle Nat. Bank v Lamy, 12 Misc 3d 1191 [A], at *2 [Sup Ct, Suffolk County 2006]*) . . . ("A nominee of the owner of a note and mortgage may not effectively assign the note and mortgage to

another for want of an ownership interest in said note and mortgage by the nominee.")

The New York Court of Appeals in *MERSCORP, Inc. v Romaine (8 NY3d 90 [2006]*), explained how MERS acts as the agent of mortgagees, holding at 96: In 1993, the MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages. Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages. Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system. [Emphasis added]

Therefore, it is clear that MERS's relationship with its member lenders is that of agent with principal. This is a fiduciary relationship, resulting from the manifestation of consent by one person to another, allowing the other to act on his behalf, subject to his control and consent. The principal is the one for whom action is to be taken, and the agent is the one who acts. It has been held that the agent, who has a fiduciary relationship with the principal, "is a party who acts on behalf of the principal with the latter's express, implied, or apparent authority." (*Maurillo v park Slope U-Haul, 194 AD2d 142, 146 [2d Dept 1992]*). "Agents are bound at all times to exercise the utmost good faith toward their principals. They must act in accordance with the highest and truest principles of morality." (*Elco Shoe Mfrs. v Sisk, 260 NY 100, 103 [1932]*). (See *Sokoloff v Harriman Estates Development Corp., 96 NY 409 [2001]*; *Wechsler v Bowman, 285 NY 284 [1941]*; *Lamdin v Broadway Surface Advertising Corp., 272 NY 133 [1936]*). An agent "is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." (*Lamdin, at 136*).

In the instant case, MERS, as nominee for AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP.), is an agent of AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP.) for limited purposes. It can only have those powers given to it and authorized by its principal, AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP). Given that AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP.) was no longer an existing company in March 2010 when MERS assigned the subject mortgage (DOT) to AHMSI, it is clear that MERS acted own its own without any valid authority from an unknown beneficiary and note holder of the subject mortgage.

MERS, acting as the original lender's nominee and Beneficiary in the DOT (but not the named lender and mortgagee in Note) does not have the power and authority to assign the mortgage (DOT) and endorse the Note.

While the DOT recognizes MERS' rights in the DOT are those granted by the borrower in that security instrument, and gives MERS the right to assign the mortgage if only allowed by "law or custom." However, in the latter requirement, neither term is defined in the DOT. MERS is not the holder of the Note, and did not come within definition of a Note Holder as defined in the Note. MERS did not provide any funds on the loan and was not a real party to the original

loan transaction. MERS has none of the lender's rights under the DOT, is not mentioned in the Note, and has no independent authority to enforce the DOT under its terms. MERS cannot acquire mortgage loans because it may only hold bare legal title in a nominee capacity; is contractually prohibited from exercising any rights with respect to mortgage loans. MERS cannot hold or assign any promissory note or any deed of trust; has no right to payment under the any note; and does not underwrite loans, make credit decisions, collect payments, hold escrow or provide any loan servicing functions whatsoever. To emphasize again, MERS is not the Lender in either the Note or DOT. In order for MERS' Assignment of DOT to be valid, MERS must have a current valid and specific written direction and authorization from ABC, the Lender of record, to assign the mortgage. There was none on this specific case. AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP.) is defunct and no longer exists as an operating COMPANY since.

In reviewing all of the documents regarding the subject mortgage loan, including all of the mortgage instruments which were recorded in the official records of the Monterey County Recorder, there is no evidence or supporting document demonstrating how AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP.), a non-operating and non-legally existing entity in 2010, could have authorized MERS, as nominee for AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP.), to assign the subject mortgage loan on March 10, 2010 to AHMSI, as Servicer for MASTR ARM TRUST 2007-1.

Moreover, the subject mortgage loan was already long sold over almost three (3) years earlier in December 2006 by Sponsor/Transferor UBS RES as a verified securitization transaction with Depositor MASTR pursuant to the binding terms of the governing *Pooling and Servicing Agreement* ("PSA") which formed the MBS TRUST. At best but subject to validation, AHMSI, a separate entity to defunct AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP.), only took over loan servicing on the subject loan. Mortgage Servicing Right ("MSR") does not encompass title or ownership in a mortgage loan. That is another incontrovertible fact.

Recently, in *Bank of New York v Alderazi, 28 Misc 3d at 379-380*, Kings County Supreme Court Justice *Wayne Saitta* explained that: A party who claims to be the agent of another bears the burden of proving the agency relationship by a preponderance of the evidence (*Lippincott v East River Mill & Lumber Co., 79 Misc 559 [1913]*) and "[t]he declarations of an alleged agent may not be shown for the purpose of proving the fact of agency." (*Lexow & Jenkins, P.C. v Hertz Commercial Leasing Corp., 122 AD2d 25 [2d Dept 1986]; see also Siegel v Kentucky Fried Chicken of Long Is. 108 AD2d 218 [2d Dept 1985]; Moore v Leaseway Transp/ Corp., 65 AD2d 697 [1st Dept 1978].*) "[T]he acts of a person assuming to be the representative of another are not competent to prove the agency in the absence of evidence tending to show the principal's knowledge of such acts or assent to them." (*Lexow & Jenkins, P.C. v Hertz Commercial Leasing Corp., 122 AD2d at 26, quoting 2 NY Jur 2d, Agency and Independent Contractors § 26*).

Simply said, there is just no evidence to demonstrate or explain how original lender AMERICAN BROKERS CONDUIT (or AMERICAN HOME MORTGAGE CORP.), no longer an

existing entity in 2010, could have validly authorized MERS to assign the secured debt under the DOT. It is the conclusion of this examiner that MERS' Assignment of DOT to U.S. BANK, as Trustee for the MASTR ARM TRUST 2007-1 is not only defective but also fraudulent, and therefore VOID without any legal force and effect.

Because the first mortgage assignment from MERS to AHMSI, not a party to the original loan transaction or the purchaser of the mortgage loan in the securitization transaction in December 2007, it follows that the second Assignment of DOT by purported assignee AHMSI, as assignor to U.S. BANK in its sole capacity as Trustee for the MASTR ARM TRUST 2007-1, is also invalid and a nullity. Such mortgage assignments further clouded the broken title of the property.

## Mortgage Securitization Review

* To review again – Before securitization, the holder of an enforceable note has a financial responsibility for any losses that may occur arising from a possible default, which means that holder also has the authority to take steps to avoid any such losses (the right to foreclose). Securitization, however, effectively severs such financial responsibility for losses. With securitization the mortgage is converted into something different from what was originally represented to the mortgagor. For one thing, since the party (or parties) taking action to foreclose does not actually hold any legal or equitable interest in any securitized mortgage, they have not realized any loss or damages resulting from the purported default. Therefore, it also follows that the foreclosing party avoids the liability, which could result if a class of certificate holders claimed wrongful injury resulting from a modification made to achieve an alternate dispute resolution.

* Securitization also makes the mortgage and note unalienable. The reason is simple: once the investment certificates to holders have been issued, the note cannot be transferred, sold or conveyed; at least not in the sense that such a transfer, sale, or conveyance should be considered lawful, legal, and legitimate. This is because the securitized note forever changes the nature of that instrument in an irreversible manner. It might appear that the inability to alienate the note has no adverse consequences for the debtor, but recent history disproves this notion. Several legislative and executive efforts to pursue alternative dispute resolution and to provide financial relief to distressed homeowners have been thwarted by the inability of the United States government to buy securitized mortgages without purchasing most of the certificates issued.

* A Special Purpose Vehicle (SPV) such as the MBS Trust cannot sell any individual mortgage because the multiple certificate holders (investors) do not hold mortgages individually; the certificate holders own the thousands of mortgages held in the name of the REMIC collectively. Likewise, the certificate holders cannot sell the mortgages. All the certificate holders have are the securities, each of which can be publicly traded. The certificate holders are, in no sense, holders of any specific individual note and have no legal interest in any

specific individual note. The certificate holders do not each hold undivided fractional interests in a note, which added together, total 100%. The certificate holders also are not the assignees of one or more specific installment payments made pursuant to the note. For the certificate holder, there is no note. A certificate holder does not look to a specific note for their investment's income payment. Instead, the certificate holder holds a security to a bond ("bond certificate") with specific defined payments. The issuer of trust certificates is selling segments of cash flow. The concept of securitization is brilliant. It began as a simple idea; a way to convert illiquid, long term debt into liquid, tradable short-term debt. It cashes out the lender, allowing the lender to make new "loans" while realizing an immediate profit on the notes sold.

- To visually frame a complete picture relating to the required legal processes associated with securitization, the *Mortgage Securitization Flow Chart (See Chart 7, Page 19)*, shows and follows the flow of the required chain of assignments of mortgage (Deed of Trust) and endorsement, transfer, conveyance and possession of the mortgagor's original "wet ink" Promissory Note for a party enforcing foreclosure action against the mortgagor (borrower). The procedure for selling of the loans was to create a situation whereby certain REMIC provisions under the Tax Code were observed, and whereby the lender ("loan originator") selling its mortgage loans to the securitization trust entity (issuer of trust's certificates) would be protected from issues regarding either entity going into bankruptcy. For the MBS Trust to acquire this protection from Lender and Issuer from bankruptcy, two "True Sales" of the loans had to occur, when loans were transferred to different entities. A "True Sale" of the loan would be a circumstance whereby one party owned the Note, and then sold it to another party. An offer would be made, and then accepted, with compensation given to the "Transferor" in return for the Note. The Notes would be transferred, and the security instruments (Mortgages or Deeds of Trust) "assigned to the buyers" of the Note, with an assignment made every step of the way, and each Note endorsed to the next party. The *Mortgage Securitization Flow Chart* outlines the proper process to maintain a valid lien, one that would permit a loan servicer to foreclose on a borrower in purported default on behalf of the MBS Trust.

# SECTION IV: DEFECTS AND DEFICIENCIES, CONCLUSION

## Loan Modification

- Any loan modification attempt would be subject to the existing securitization Agreements.

## Mortgage Securitization Issues

- Original lender AMERICAN BROKERS CONDUIT (hereinafter "ABC") sold the mortgage loan through AMERICAN HOME MORTGAGE CORP. ("AHMC") in the secondary market and purchased by mortgage loans aggregator and securitization Sponsor/Transferor UBS REAL ESTATE SECURITIES, INC. ("UBS RES") who in turn sold it to MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC. ("MASTR"), the depositor in a securitization transaction who formed MASTR ADJUSTABLE RATE MORTGAGES TRUST 2007-1 ("MASTR ARM TRUST 2007-1") Immediately thereafter, this depositor securitized the subject mortgage loan (bundled with other mortgages in a pool) into the MASTR ARM TRUST 2007-1, a mortgage-backed securities trust (the "MBS Trust") with a *Real Estate Mortgage Investment Conduit* ("REMIC") election and qualification pursuant to the Tax Code of 1986, as amended (the "Tax Code").

- The required order of intervening endorsement of the mortgage Note and assignment of the Deed of Trust pursuant to the securitization agreements would be as follow on or before the MBS Trust Closing Date (also the REMIC Startup Day) on January 16, 2007:

  1. From original lender ABC (through AHMC) to UBS RES, as purchaser, sponsor and loan transferor in the securitization transaction;
  2. From sponsor/transferor UBS RES to MASTR, as purchaser/securitization depositor; and
  3. From securitization depositor MASTR to U.S. BANK, as Trustee for MASTR ARM TRUST 2007-1 ("the "MBS Trust.")

Any late conveyance of the subject mortgage loan after the MBS Trust's Closing Date (REMIC Startup Day on January 16, 2007) is strictly not permitted; it is a violation of the terms of the pa and the related securitization agreements. <u>While original lender ABC (through AHMC), UBS RES, and MASTR all got paid in full ("*True Sale*") when these securitization parties sold the subject mortgage loan to the MBS Trust, each party (beginning from loan originator AHMC) committed a material breach and misrepresentation under the securitization agreements when the mortgage loan was in fact not validly transferred and conveyed to the MBS Trust on or before its Closing Date.</u> Any attempt to assign and transfer the subject mortgage loan (now considered a "non-qualified" mortgage loan) at this late date would trigger an *Adverse REMIC Event*, resulting to the disqualification and discontinuance of the income tax-free status and treatment of the MBS Trust; and such non-compliance to the its REMIC trust provisions now

exposes MASTR ARM TRUST 2007-1 to substantial tax liabilities and penalties, retroactively from the date of the violation.

The Master Servicer, the REMIC Administrator and the Trustee are specifically prohibited from taking any action that would jeopardize the REMIC status of the Trust – specifically prohibiting the contribution and/or acceptance of mortgage loan assets into the MBS Trust after its Closing Date (the REMIC "Startup Day" on January 16, 2007).

- Because the subject mortgage loan was in fact long sold by original lender ABC (through AHMC) and UBS RES, in turn long sold it in the securitization transaction in December 2006, both entities were already paid in full on the loan. The governing *Pooling and Servicing Agreement* and the REMIC provisions on the securitization of the subject mortgage loan strictly mandated an absolute *"True Sale"* by the loan transferor and sponsor UBS RES to securitization depositor MASTR, and from this depositor to U.S BANK, as Trustee for the MASTR ARM TRUST 2007-1. Compliance to this REMIC requirement was in fact represented and warranted by all parties in the executed *Pooling and Servicing Agreement* (PSA). In the PSA, as Loan Transferor/Sponsor and Master Servicer, respectively, did not only acknowledged, represented and warranted that the subject mortgage loan was sold in the securitization transaction, but was (and is) fully cognizant that MERS does not have the authority and power to assign the subject securitized mortgage loan. The offering *Prospectus Supplement* dated 1/16/2007 in fact specifically states, *"For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan."*

- Notwithstanding, the required complete intervening endorsements of the original Note and securitization chain of assignments of the mortgage (DOT) from loan originator-to-sponsor, from sponsor-to-depositor, and from depositor-to-trustee (of the MBS trust), within the Trust's Closing Date in January 16, 2007 NEVER happened. As noted earlier based on the chain of title review conducted on July 19, 2012, the official record of the Monterey County Recorder on the subject mortgage only shows 2 invalid and fraudulent Assignments of the Deed of Trust from MERS, to AHMSI and then from AHMSI directly to U.S. BANK, as trustee for MASTR ARM TRUST 2007-1 in 2010, *WELL AFTER THE CLOSING DATE OF JANUARY 16, 2007*. Because the subject mortgage loan was never assigned and validly transferred to U.S. BANK, as Trustee for MASTR ARM TRUST 2007-1, the MBS Trust does not hold the title and beneficial interest in the mortgage Note and DOT. An irreversible broken chain of title now exists on the property securing the subject mortgage loan.

## Foreclosure Action Deficiencies & Defects

- The assignment of mortgage by MERS is not only defective but also fraudulent for the following reasons:

    1. It cannot be disputed based on supporting evidence submitted with this forensic audit

report (*i.e.*, *Exhibits 1 and 2: the Securitization Agreements executed under oath; the Prospectus Supplement for the MBS Trust: MASTR ARM TRUST 2007-1; and the Pooling and Servicing Agreement as filed by securitization Registrant and Depositor MASTR with the SEC*) that the subject mortgage loan was long sold in December 2006 by the original lender ABC (through AHMC) in the secondary market for securitization.

2. As represented and warranted by all parties concerned in the securitization agreements, <u>loan aggregator/Transferor and securitization sponsor</u> UBS RES irrevocably sold the mortgage loan to Depositor MASTR, who thereafter immediately securitized and sold the mortgage loan to the MBS Trust: MASTR ARM TRUST 2007-1 on or before the Trust's Closing Date on January 16, 2007. As cited, however, it was verified from the official records of the Monterey County Recorder that there were two invalid and fraudulent assignments of the mortgage by MERS to AHMSI and from AHMSI directly to U.S. BANK, as Trustee for MASTR ARM TRUST 2007-1 in 2010, and it is almost certain that when the original mortgage note is demanded for presentation, it would also not bear any endorsement by original lender ABC to any entity.

° The situation is legally problematic. While the subject mortgage loan was long sold by original lender ABC (through AHMC) in the securitization transaction in December 2006, the fact remains that the Trustee for the MASTR ARM TRUST 2007-1 does not have any evidence as an assignee/endorsee of a complete chain of assignment of the DOT and the intervening endorsement of the note; The MBS Trust does not have any valid lien and legal standing on the subject mortgage loan.

° Moreover, as original lender's nominee and beneficiary in the DOT, MERS does not have the direct specific authority nor power to make such mortgage assignment under the terms of the DOT. The DOT is a collateral security instrument, which, recognizes MERS' right in mortgage are those granted by the borrower in that security instrument, and gives MERS the right to foreclose the security if allowed by "law or custom". <u>Neither is defined in the Deed of Trust on the alleged default of the borrower (trustor).</u> <u>MERS has none of the lender's rights under the Deed of Trust, is not mentioned in the Note, and has no independent authority to enforce the Deed of Trust under its terms.</u> MERS is a membership based electronic data system to record assignment of mortgages in place of recording in local land records. MERS: 1) **cannot acquire mortgage loans because it may only hold bare legal title in a nominee capacity; 2) is contractually prohibited from exercising any rights with respect to mortgage loans**, and cannot foreclose without direct authorization; 3) **cannot hold or assign any promissory note or deed of trust; 4) has no right to payment under the mortgage Note**; 5) does not underwrite loans, make credit decisions, collect payments, hold escrow or provide any loan service functions *whatsoever*.

### MORTGAGE NOTE and DEED SEPARATED

<u>MERS is not named or referenced in the mortgage Note as the Lender or in any capacity.</u> The Deed of Trust, which the borrower executed, recites that MERS is the beneficiary under the Deed of Trust and recognizes that this security instrument secures to the Lender the

repayment of the loan and borrower's performance to meet the obligation. *The Deed of Trust, as security instrument, follows the Note.* The Deed of Trust does not carry the consent of the lender. *In this particular case such security instrument is a direct contradiction of the Note* because the Note states that the Deed of Trust shall benefit the Lender.

Case law supports that the Mortgage follows the Note; the Note does not follow the assignment of the Mortgage (the debt does not follow the mortgage). *The Mortgage (Deed of Trust) is a collateral security instrument, which, in order to be transferred, must be transferred by the owner of the obligation. The Note states that the Lender may transfer the Note; and the Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."*

*The Honorable Samuel L. Bufford, United States Bankruptcy Judge, addressed then abovementioned issues in re: Raymond Vargas, Debtor, Case No.: LA08-17036SB, Central District of California when an entity other than the Note Holder—MERS, at the time attempted to foreclose on a homeowner. Judge Bufford stated, "There are two issues that MERS must address with respect to the promissory note. First, it must authenticate the note. Second, it must show that it is entitled to enforce the note." Regarding the right to enforce the Note, Judge Bufford stated, "Only the holder of a negotiable promissory note is entitled to enforce the Note. The holder enforces the note by making a demand for payment. The person making a demand shows its right to enforcement by showing the original of the promissory note." Based on the language in the subject Note, as well as Judge Bufford's comments, the beneficiary party under the Note is the only party to enforce the Note via a foreclosure action.*

Generally, if the Deed of Trust and the Note are not together with the same entity, there can be no enforcement of the Note. *The Deed of Trust provides the standing for the lender to foreclose on a property based on default on the Note. Thus,* if the security instrument (Deed of Trust) and the financial instrument (Note) are separated, foreclosure cannot legally be pursued: The Note cannot be enforced by the Deed of Trust if each contains a different party in interest; *and,* if the Deed of Trust is not itself a legally enforceable instrument, there can be no valid foreclosure on the homeowners' property. *Legal precedence of recent public law cases exists for these conclusions: Saxon vs. Hillery, CA, Dec 2008, Monterey County Superior Court and (In re Hudson, 643 S.E. 2d 485 (N.C. Ct. App. 2007).*

*As a matter of law, the abovementioned conclusion is also supported and addressed in a recent MERS' related court case decision. In re: Bellistrini v. Ocwen Loan Servicing, Missouri Court of Appeals, Case No. ED91369 filed March 3, 2009 Chief Justice Nannette A. Baker reaffirmed the judgment of the circuit court of St. Louis County declaring that Ocwen Loan Servicing "lacked a legally cognizable interest in the property, and therefore, it has no standing to seek relief." In this case,* MERS is named as nominee beneficiary in the Deed of Trust. However, MERS is NOT named on the note. *This appellate case from Missouri, quoting the Restatement 3rd, simply says that* the note was split from the security instrument, and

*that there is no enforcement mechanism available under the Deed of Trust. Hence, the court concludes, "quiet title" was entirely appropriate and the only remedy to the situation because once the Deed of Trust and Note are split there is no way to get them back together.*

- Pursuant to *Covenant No. 24* of the *Deed of Trust*, only the lender (in this case ABC or its duly authorized agent) has the power and authority to do so under the DOT.

   **The Non-Uniform Covenant No. 24** in the Deed of Trust states, *"**Substitute Trustee**. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder **by an instrument executed and acknowledged by Lender** and **recorded in the office of the Recorder of the county in which the Property is located**. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and Page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution."*

- **Notice of Default (NOD) and Notice of Trustee's Sale (NOTS).** Because the instruments assigning the mortgage and trustee substitution appointing POWER DEFAULT SERVICES, INC., as purported trustee in the DOT are each defective, fraudulent and not valid, it follows that the NOD (Exhibit "F") and NOTS (Exhibits "G"), issued by SERVICELINK and T.D. SERVICE COMPANY, respectively, without valid authority, were also null and VOID.

## Conclusion

- Pursuant to the securitization agreements, the required complete chain of intervening endorsement of the mortgage note and assignment of DOT from loan originator-to-sponsor, sponsor-to-depositor, and ultimately from depositor-to-trustee (of the MBS trust) within the securitization Closing Date did NOT take place as verified by the chain of title review on the subject mortgage from the official records of the Monterey County recorder on July 19, 2012.

- There may be important legal issues worth addressing related to the issue of whether *"True Sales"* took place with regard to the transfer of the Note through the securitization chain. Such *True Sale* must be evidenced by 1) legal opinions from each party that require fulfillment of the conditions for sale and purchase, 2) an arms' length relationship between the parties, and 3) evidence of the capacity of the securitization parties to buy and sell, which is questionable when the so called lender's loan funds may have been pre-funded from inception by the buyer/certificate holders (investors) of the MBS Trust. Conclusion of a *True Sale* would appear to deny rights as holder in due course for the current party (or parties) attempting to foreclose on the mortgaged property, making unsupported and unproven claim to be the secured creditor and beneficiary on the subject mortgage loan.